IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MARKELLE NEAL TAYLOR,

        Petitioner,                  No. CIV S-05-0788 MCE GGH P

    vs.

TOM CAREY, et al.,               ORDER AND

        Respondent.        FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2002 conviction for the second degree murder (Cal. Penal Code § 197(a)) of Marcel White and the infliction of corporal injury resulting in a traumatic condition on Garvon White (Cal. Penal Code § 273.5(a)). The jury also found that petitioner inflicted great bodily injury under circumstances involving domestic violence (Cal. Penal Code § 12022.7(e)) and that with intent to injure and without consent petitioner personally inflicted injury on Garvon White, whom he knew or should have known was pregnant and the injury resulted in the termination of her pregnancy (Cal. Penal Code § 12022.9, former section (a)). Petitioner is serving a sentence of 15 years to life.

/////

1

1    This action is proceeding on the amended petition filed December 11, 2005.  After

2  carefully considering the record, the court recommends that the petition be denied.

3  II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

4    The AEDPA "worked substantial changes to the law of habeas corpus,"

5  establishing more deferential standards of review to be used by a federal habeas court in

6  assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

7  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

8    In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

9  Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

10  for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

11  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

12  "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

13  to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

14  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

15  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

16    "Unreasonable application" of established law, on the other hand, applies

17  mixed questions of law and fact, that is, the application of law to fact where there are no factually

18  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

19  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

20  AEDPA standard of review which directs deference to be paid to state court decisions.  While the

21  deference is not blindly automatic, "the most important point is that an *unreasonable* application

22  of federal law is different from an incorrect application of law....[A] federal habeas court may not

23  issue the writ simply because that court concludes in its independent judgment that the relevant

24  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

25  that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

26  1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

1 objectively unreasonable nature of the state court decision in light of controlling Supreme Court

2 authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

3       The state courts need not have cited to federal authority, or even have indicated

4 awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S.

5 Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is

6 contrary to, or an unreasonable application of, established Supreme Court authority. Id. An

7 unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

8 occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the

9 established Supreme Court authority reviewed must be a pronouncement on constitutional

10 principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

11 binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

12       However, where the state courts have not addressed the constitutional issue in

13 dispute in any reasoned opinion, the federal court will independently review the record in

14 adjudication of that issue. "Independent review of the record is not de novo review of the

15 constitutional issue, but rather, the only method by which we can determine whether a silent state

16 court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

17 2003).

18       When reviewing a state court's summary denial of a claim, the court "looks

19 through" the summary disposition to the last reasoned decision. Shackleford v. Hubbard, 234

20 F.3d 1072, 1079 n. 2 (9th Cir. 2000). On direct appeal, the California Court of Appeal was the

21 last state court to issue a reasoned decision. The California Supreme Court denied petitioner's

22 petition for writ of habeas corpus without comment or citation. As to each claim, this court will

23 discuss which state court opinion is entitled to AEDPA deference.

24 III.  Factual Background

25       The opinion of the California Court of Appeal contains a factual summary of

26 petitioner's offense. After independently reviewing the record, the court finds this summary to

3

be accurate and adopts it below.

In August 2001 defendant lived with Garvon White in Sacramento.FN1 White was seven months pregnant with defendant's child.

FN1. All further dates are in 2001 unless otherwise stated.

On August 9, White and defendant argued. She told him he could pack his things and leave. He got angry and punched her in the head. White said she would do what the mother of his other children had done-take his baby and leave so he could not see it. She knew this would anger him.

Defendant punched White twice in the stomach, knocking her down. He kept on hitting her while she was on the floor as he spoke to his brother on the telephone. Looking sweaty and crazed, he yelled: "I don't want this baby." "I don't want this bitch to have my baby." He hit her six times in the stomach altogether.FN2

FN2. At trial, White testified that she could not recall telling the police defendant had hit her six times and claimed she had exaggerated the severity of the assault out of anger. Before trial she had falsely told a defense investigator that another woman punched her in the stomach, not defendant. White was an extremely reluctant witness who testified in custody after evading subpoena and being brought in on a bench warrant. Although she told a story generally in line with her prior statements (aside from that given to the defense investigator), she minimized defendant's actions as far as possible and portrayed herself as habitually violent toward defendant and others.

White felt a knot in her stomach and became frightened. Defendant said he was afraid he had killed or hurt the baby. He later said to a neighbor that he had screwed up and did not want to be charged with murder if the baby died.

White walked across the street to a fire station. A paramedic, after interviewing her, had her transported by ambulance to the hospital where Dr. Derek Wong, White's obstetrician/gynecologist, was on duty. Dr. Wong had cared for White during her pregnancy, which had been uncomplicated up to then, with a delivery due date of October 31.

White told Dr. Wong defendant had hit her five or six times in the stomach and she was cramping. Dr. Wong found significant bruising. After performing a maternal blood test, a fetal heart rate check, and an ultrasound examination, he decided to perform an immediate Caesarean section surgery (C-section). He suspected internal bleeding from a placental abruption, or premature separation of the placenta from the uterine wall, which could kill the fetus from ongoing blood loss.

On performing the C-section, Dr. Wong discovered a placental abruption which had produced blood inside the amniotic fluid and a large blood clot. The beating White had described could cause such an injury. There was no evidence that anything else had caused it.

When delivered by C-section on August 9, the baby (named Marcel) was just over 28 weeks old and weighed less than three pounds. Although 80 to 90 percent of babies born that prematurely survive, there are always complications, and such a baby needs months of care to be able to live outside the nursery.

Marcel also had Down's syndrome, including a heart defect normally repairable by surgery. His premature birth did not cause these conditions, but it made them harder to treat.

Dr. Faisal Ezzedeen, a neonatologist, put Marcel on life-support systems, then began treating him for the problems caused by his heart defect and by the immaturity of his lungs and gastrointestinal tract.

One risk caused by prematurity is necrotizing intercolitis, a condition almost never found in full-term babies. It develops some time after birth, often very suddenly. In this condition, believed to result from the underdeveloped state of the infant's digestive system, an infection takes hold in the small bowel, which causes the mucosa to slough off, sometimes leading to necrosis and perforation.

Marcel was fed through a tube for the first week after his delivery. Oral feeding began on August 17.

On September 5, Marcel's abdomen distended and he began spitting up his food. The treatment team determined necrotizing intercolitis had set in. Antibiotics did not help. Exploratory surgery found that the small bowel was almost entirely dead, an inevitably fatal condition. Taken off life support, Marcel died.

In Dr. Ezzedeen's opinion, it was extremely unlikely that Marcel would have developed necrotizing intercolitis if born at term; Dr. Ezzedeen had treated over 100 cases and had never seen one in a full-term baby. He could not exclude Marcel's heart defect as a risk factor for the condition, but it was not the cause. The medical community does not know why the condition is more severe in some infants than in others.

Dr. Gregory Reiber, a forensic pathologist, performed an autopsy on Marcel on September 6. He opined that death occurred due to complications of prematurity, with the additional complicating factor of a congenital heart defect. At 28 weeks, Marcel was very premature, almost extremely so; babies born that prematurely can develop malfunctions of the brain, lungs, intestines, liver, and kidneys.

In Dr. Reiber's opinion, Marcel's prematurity was the "proximate cause" of death, but it was also "a primary factor leading to the [necrotizing intercolitis]." This can be so because immature lungs deliver insufficient oxygen to the intestinal tract, and because oral feeding can lead to gastrointestinal difficulties. Marcel's inadequate lung development had caused respiratory diseases and brain hemorrhages before his death.

According to Dr. Reiber, if Marcel had been born at term with the same Down's syndrome and heart defect, he would have had only a 5- to 6-percent risk of mortality. However, the heart defect increased his risk for the complications associated with prematurity.

On August 10, Garvon White told Laura Bardman Murray, a social worker, that she and defendant had been in a violent relationship for a year; once he broke her arm while she was pregnant. On August 12, White told Murray defendant had beaten her abdomen another time during the pregnancy but she had not reported it.

Thelma Cruz-Taylor, defendant's estranged wife and the mother of his children, testified that defendant had repeatedly slapped and struck her while she was pregnant. In 1998, after she had left him and taken the children, he came to her apartment, told her he would be happy only if she were dead, and choked her.

Additional facts appear below as relevant to particular issues.

Opinion of California Court of Appeal lodged May 30, 2007, pp. 4-8.[1]

IV.  Discussion

A.  Claim 1: Prosecutorial Misconduct

Petitioner alleges that the prosecutor committed misconduct by violating a court order concerning presentation of testimony which implied that petitioner or his counsel influenced White to make statements favorable to the defense.  The background to this claim is as follows.

The prosecutor proposed calling Deputy District Attorney Ore to testify regarding his interaction with White before the murder charges were filed.  The prosecutor argued that Ore's testimony was relevant to establish that White's attitude toward the case changed after she had conversations with the defense team or petitioner himself.  RT at 669.  The prosecutor theorized that White's claim that she herself was the aggressor was fabricated because she did not want petitioner to be convicted.  RT at 669, 674.

The trial court ruled that White's attitude toward the prosecution was relevant and that Ore could discuss those issues and any reference to *petitioner* telling her how to testify or influencing it, but not any member of the defense.  RT at 669.  The prosecutor was supposed to notify Ore that he was precluded from making any insinuation relating to the defense engaging in

---

[1]  The state court records lodged by respondent do not contain numbers, for example, "lodged document no.1."  For that reason, the court refers to the document by name rather than number.

unethical behavior.  RT at 669.

During defense counsel's cross-examination of Ore on Thursday July 11, 2002, he testified in violation of the court order described above:

> Q: And did she tell you anything about whether she had ever done anything to Mr. Taylor in the past?
>
> A: Soon after the death of the baby, in one of our meetings, she had met with, I believe, Mr. Taylor or the defense and began talking about things she had done, aggressive things.

RT at 657.

Defense counsel did not object to the answer at that time.  At the conclusion of Ore's testimony that day, the prosecution called another witness.  When court resumed on Monday July 15, 2002, petitioner's counsel moved for a mistrial based on Ore's testimony set forth above.  Defense counsel stated that she did not object at the time Ore testified because she decided that calling attention to it at the time would cause more damage.  RT at 672.  Petitioner's counsel argued that the defense had not attempted to influence White, as suggested by Ore.  RT at 669.  Defense counsel also argued that if there was to be an insinuation of unethical behavior on the part of the defense team, it would create a conflict of interest for the defense.  RT at 670.  Counsel also argued that the insinuation undermined the credibility of the defense.  RT at 670.

The trial court found that the prosecution had not elicited the testimony.  RT at 675.  It is also clear, and undisputed, that the prosecutor had informed Ore of the protective order before his testimony.  RT at 722.

The court found that Ore's testimony violated the order which prohibited him from testifying that White's testimony was influenced by her contact with the defense team.  RT at 684.  The court denied the motion for a mistrial and instead ordered the reporter's transcript modified to eliminate the improper testimony.  RT at 693-694.  The court ordered the prosecution to call Ore to the stand outside of the presence of the jury.  In this proceeding, Ore testified that the prosecutor had told him that the court ordered her not to ask him any questions

1   regarding whether White spoke to the defense or defense team.  RT at 722.  Ore testified that he

2   understood the court's order as limiting mention of White meeting with defense counsel, but not

3   the defense investigator.  RT at 725.  Outside of the presence of the jury, Ore testified that he

4   believed that White had been swayed by defense counsel and/or her investigator, although he had

5   no evidence of this.  RT at 725-726.

6            Because Ore believed that the defense had influenced White's testimony, he was

7   not recalled to testify.  Instead, the jury was read the following stipulation:

8            There is no evidence that the defendant told Garvon White what to say or how to
          testify.  Number two–that was number one.  Number two, any reference by Mr.
9          Ore to a meeting between Ms. White and the defense refers to the October 17
          interview with Ms. Lundberg and Ms. Odbert.
10

11   RT at 740.

12            The California Court of Appeal rejected this claim for the following reasons:

13            To begin with, we reject defendant's assertion that the prosecutor committed
          misconduct by encouraging misconduct of the witness.  It is misconduct for a
14          prosecutor to use deceptive or reprehensible methods to persuade the court or the
          jury.  (People v. Hill (1998) 17 Cal.4th 800, 819.)  However, the trial court found
15          the prosecutor had not done so, and we agree.  Contrary to defendant's
          insinuation, there is nothing in this record to show that the prosecutor violated the
16          court's order or knowingly elicited Ore's improper testimony.  The record shows,
          rather, that after the court made its original order the prosecutor scrupulously
17          avoided asking any questions which would have called for the kind of answer Ore
          gave.  The question which produced that answer clearly did not call for it and the
18          prosecutor could not have anticipated that Ore would give such an answer.  Ore's
          misconduct, which took everyone by surprise, cannot be imputed to the
19          prosecutor.

20            Furthermore, defendant did not raise a timely objection and request for
          admonition, which is normally required to preserve a claim of misconduct on
21          appeal.  (People v. Hill, supra, 17 Cal.4th 800, 820.)  Absent an explanation why
          such measures would not have cured the harm, counsel's next-day mistrial motion
22          did not suffice to preserve issue.

23            In addition, defendant fails to explain why counsels' stipulations as read to the
          jury were insufficient to cure any possible harm.  The court properly instructed the
24          jury it was required to take those stipulations as proven fact.  Having been
          instructed that there was no evidence of any meetings between defendant and
25          White, or any meeting between White and defense counsel other than one about
          which the jury had already heard evidence, the jury was presumably able to follow
26          the court's instruction.  (People v. Adcox (1988) 47 Cal.3d 207, 253.)

8

1   Defendant has shown no grounds for reversal at this time.

2   Opinion of California Court of Appeal, pp. 35-36.

3   In the answer, respondent argues that petitioner's claim is procedurally defaulted

4   because the California Court of Appeal found the claim waived based on defense counsel's

5   failure to timely object.

6   The California Supreme Court summarily denied petitioner's petition for review.

7   See September 28, 2004, order by California Supreme Court denying petition for review lodged

8   May 21, 2007. "[W]here, as here, the last reasoned opinion on the claim explicitly imposes a

9   procedural default, we will presume that a later decision rejecting the claim did not silently

10   disregard that bar and consider the merits." Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.Ct.

11   2590 (1991). Applying the look through doctrine, it follows that the California Supreme Court's

12   denial was on the procedural grounds stated in the opinion of the California Court of Appeal.

13   Under the doctrine of procedural default, a petitioner who has defaulted on his

14   claims in state court is barred from raising them in federal court so long as the default is

15   "pursuant to an independent and adequate state procedural rule." Coleman v. Thompson, 501

16   U.S. 722, 750, 111 S.Ct. 2546 (1991). In Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003),

17   the Ninth Circuit adopted a burden-shifting analysis to determine adequacy. Under this analysis,

18   the state may plead, as an affirmative defense, that the petitioner's failure to satisfy a state

19   procedural bar should foreclose federal review. 322 F.3d at 586. Once the state pleads the bar,

20   the burden shifts to the petitioner to challenge the adequacy of that bar by showing that it has

21   been inconsistently applied. Id. The state has the ultimate burden of proving adequacy. Id.

22   In the instant case, the California Court of Appeal found that petitioner's claim

23   was barred based on counsel's failure to object at trial. California's contemporaneous objection

24   rule is an independent and adequate state procedural rule that precludes federal review of claims.

25   Paulino v. Castro, 371 F.3d 1083, 1092-1093 (9th Cir. 2004).

26   \\\\\

1     If there is an independent and adequate state ground for the decision, the federal

2   court may still consider the claim if the petitioner demonstrates:  (1) cause for the default and

3   actual prejudice resulting from the alleged violation of federal law, or (2) a fundamental

4   miscarriage of justice.  Harris, 489 U.S. at 262, 109 S. Ct. at 1043.  The existence of cause for a

5   procedural default must ordinarily turn on whether the prisoner can show that some objective

6   factor external to the defense impeded counsel's efforts to comply with the State's procedural

7   rule.  McCleskey v. Zant, 499 U.S. 467, 493-94, 111 S. Ct. 1454, 1476 (1991).  Examples of

8   cause include showings "that the factual or legal basis for a claim was not reasonably available to

9   counsel," "that some interference by officials made compliance impracticable," or "of ineffective

10   assistance of counsel."  Murray, 477 U.S. at 488, 106 S. Ct. at 2645.  Prejudice is difficult to

11   demonstrate:

12          The showing of prejudice required under Wainwright v. Sykes is
             significantly greater than that necessary under "the more vague
13          inquiry suggested by the words 'plain error.'"  Engle, 456 U.S., at
             135, 102 S.Ct., at 1575; Frady, supra, 456 U.S., at 166, 102 S.Ct.,
14          at 1593.  See also Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct.
             1730, 1736, 52 L.Ed.2d 203 (1977).  The habeas petitioner must
15          show "not merely that the errors at ... trial created a possibility of
             prejudice, but that they worked to his actual and substantial
16          disadvantage, infecting his entire trial with error of constitutional
             dimensions."  Frady, supra, at 170, 102 S.Ct., at 1596.

17

18   Murray v Carrier, 477 U.S. at 493-494, 106 S. Ct. at 2648 (1986).

19   Although different phraseology is used in the default context from that used in the ineffective

20   assistance of counsel prejudice inquiry, as stated above, the ultimate application of the two

21   prejudice inquiries is essentially similar – that is, whether the prejudice is sufficient to have

22   undermined the reviewer's confidence in the result of the trial.

23          Because the prosecutor committed no misconduct, petitioner has shown neither

24   prejudice nor a fundamental miscarriage of justice.  In this case, Ore voluntarily testified in

25   violation of the court order in response to a question by defense counsel.  There is no evidence in

26   the record suggesting that the prosecutor had any involvement in the misconduct by the witness.

Because no prosecutorial misconduct occurred, petitioner cannot demonstrate prejudice or a fundamental miscarriage of justice.  See U.S. v. Christophe, 833 F.2d 1296, 1300-1301 (9th Cir. 1987) (no prosecutorial misconduct where transcript shows that witness volunteered at-issue testimony); U.S. v. Etsitty, 130 F.3d 420, 424 (9th Cir. 1997) (no prosecutorial misconduct where "[n]othing in the questioning or the answers given can be construed to reflect an intention by the prosecutor to mislead the jury.").

For the reasons discussed above, this claim should be denied as procedurally barred.

### B.  Shackling

Petitioner argues that he was visibly shackled in front of the jury.  In the answer, respondent argues that the instant claim is procedurally barred because petitioner's counsel did not object.  Petitioner raised this claim in his petition for writ of habeas filed in the California Supreme Court.  See Petition filed in California Supreme Court, lodged May 21, 2007.  On November 15, 2006, the California Supreme Court denied the petition without comment or citation.  See Order by California Supreme Court lodged May 21, 2007.  Respondent's argument that this claim is procedurally barred is without merit because no state court found the claim defaulted.

"Visible shackling of a criminal defendant during trial 'undermines the presumption of innocence and the related fairness of the factfinding process' and 'affront[s]' the 'dignity and decorum of judicial proceedings that the judge is seeking to uphold.'" Larson v. Palmateer, 515 F.3d 1057, 1062 (9th Cir. 2008), quoting Deck v. Missouri, 544 U.S. 622, 630-31, 125 S.Ct. 2007 (2005).  "The Supreme Court has therefore held that 'the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, the exercise of its discretion, that they are justified by a state interest specific to a particular trial.'" Id., quoting Deck v. Missouri, 544 U.S. at 629, 125 S.Ct. 2007.  "The Court described this principle as one that is 'deeply embedded in the law,' reflecting a consensus

'dating back to the 19th century." Id., quoting Deck v. Missouri, 544 U.S. at 629, 125 S.Ct.

2007.  "Visible restraints are therefore not permitted unless the trial court finds that they are

necessary while 'tak[ing] account of the circumstances of the particular case.'" Id., quoting Deck

v. Missouri, 544 U.S. at 632, 125 S.Ct. 2007.

Petitioner argues that the following facts support this claim.  During jury

selection, the court told the jury that petitioner was in custody:

> Probably most of you have figured this out now.  But Mr. Taylor is in custody.
> That's something that has nothing to do with the evidence in this case.  It doesn't
> assist the prosecution in proving him guilty.  It is something that you shouldn't
> take into consideration.
>
> About the only effect it will have on you is that Mr. Taylor doesn't get himself to
> court.  The Sheriff's Department has to bring him.  They are short staffed, which
> means that we will seldom start exactly on time.  So that's how it will affect you.
>
> So if we are late, generally, it's because we are waiting for a deputy to free up an
> escort Mr. Taylor to the courtroom.  So that's the primary effect that it's going to
> have on you.  And it's the only thing that you can consider.  If you want to
> grumble about that, then you are certainly free to do so.  But it can't affect the way
> you view the evidence in the case.
>
> Can all of you assure us that Mr. Taylor's custody status is not going to effect
> your perception of the evidence, your weighing the evidence in this trial?

Reporter's Augmented Transcript, p. 140.

Petitioner contends that on another occasion during jury selection, the court asked,

"And can you assure us that Mr. Taylor's custody status is not going to be a factor in your

deliberations?"  Reporter's Augmented Transcript, p. 229.  Later, defense counsel reminded the

jurors that her client might be late due to his being brought over from the jail.  RT at 232.

In the amended petition, petitioner contends that he was allowed to wear street

clothes during the trial, but that he was handcuffed until being seated at the counsel table, and

handcuffed before being taken into the courtroom.  Amended Petition, p. 14: 15-17.  In the

amended petition, petitioner argues that a deputy sat ominously behind him at all times during

the proceedings.  Id., p. 15: 17-18.  Petitioner argues that the deputies assigned to the courtroom

were in such proximity to him that it was at all times obvious that petitioner was in their custody,

and that he was not free to move about as a non-custodial defendant would be.  Id., p. 14: 18-20.

Petitioner further argues that the proximity of the sheriff's deputies to him interfered with his ability to communicate with his attorney, breached attorney-client confidentiality and deterred confidential communications between himself and trial counsel.  Id., p. 14: 12-15.

As to petitioner's shackling claim, petitioner has cited no evidence suggesting that the jury actually saw him handcuffed.  It is not reasonable to infer from the comments by the court and defense counsel that they must have been referring to the jury viewing petitioner in restraints.  Petitioner's claim, through counsel, in the amended petition that he was handcuffed in the courtroom is not supported by any evidence, such as a declaration by petitioner, in either the amended petition or reply to the answer.  Counsel's verified statement in the amended petition is not sufficient evidence of this claim.  In any event, even if petitioner was handcuffed until being seated and before being removed from the courtroom, there is no claim that the jury saw petitioner during these times.  Accordingly, this claim should be denied because it is conclusory and unsupported by specific facts.  James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) (holding that conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief).

Petitioners suggests that he was "constructively shackled," i.e. the jury knew he was in custody based on the comments by the court and counsel during voir dire, etc.  No clearly established Supreme Court authority provides that it is unconstitutional for a jury to have knowledge of a criminal defendant's custody status.  Accordingly, such a claim is without merit.

Petitioner's claim that his proximity to the sheriff's deputies interfered with his ability to communicate with counsel, breached attorney-client confidentiality and deterred confidential communications between himself and trial counsel is similarly unsupported. Petitioner cites no evidence or case law to support these claims.  Accordingly, they are without merit.  James v. Borg, supra.

1    After independently reviewing the record, the court finds that the denial of these

2    claims by the California Supreme Court was not an unreasonable application of clearly

3    established Supreme Court authority.  Accordingly, these claims should be denied.

4          C.  Claim 3: Batson

5          Petitioner argues that the prosecutor's challenges to prospective jurors Hubbard

6    and Wade were motivated by racial discrimination in violation of Batson v. Kentucky, 476 U.S.

7    79, 106 S.Ct. 1712 (1986).  In the answer, respondent contends that petitioner has "forfeited"

8    these claims because he did not raise them on direct appeal.  On direct appeal, petitioner argued

9    that the prosecutor's challenge to juror Hubbard was motivated by religious discrimination in

10   violation of Batson.

11         In his petition for writ of habeas corpus filed in the California Supreme Court,

12   petitioner argued that the prosecutor's challenge to juror's Hubbard and Wade was motivated by

13   racial discrimination in violation of Batson.  Accordingly, these claims are not "forfeited."

14         Petitioner has filed a motion for discovery as to the Batson claim regarding juror

15   Hubbard.  The court begins by discussing that request.

16         "When a defendant in a criminal trial challenges the State's use of peremptory

17   strikes against racial minorities, trial courts must follow the analysis set forth in Batson v.

18   Kentucky, 476 U.S. 79 (1986), and its progeny."  Green v. LaMarque, No. 06-16254, 2008 WL

19   2761321 * 1 (9th Cir. July 17, 2008).  "First, when a criminal defendant challenges the state's

20   use of peremptory strikes, the defendant must make a prima facie case showing the challenge was

21   based on an impermissible basis, such as race."  Id., citing Batson, 476 U.S. at 98.  "This is a

22   burden of production, not a burden of persuasion."  Id., citing Johnson v. California, 545 U.S.

23   162, 170-71, 125 S.Ct. 2410 (2005).

24         "Second, if the trial court finds the defendant has made a prima facie case of

25   discrimination, the burden then shifts to the prosecution to offer a race-neutral reason for the

26   challenge that relates to the case."  Id., citing Johnson v. California, 545 U.S. 168, 125 S.Ct.

2410.  "Third, if the prosecutor offers a race-neutral explanation, the trial court must decide

whether the defendant has proved the prosecutor's motive for the strike was purposeful racial

discrimination."  Id.  "When conducting the analysis at the third step, the trial court must decide

not only whether the reasons stated are race-neutral, but whether they are relevant to the case, and

whether those stated reasons were the prosecutor's genuine reasons for exercising a peremptory

strike, rather than pretexts invented to hide purposeful discrimination."  Id.  "'In deciding if the

defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into

such circumstantial and direct evidence of intent as may be available."  Id., quoting Batson, 476

U.S. at 93.

"The 'circumstantial and direct evidence' needed for this inquiry may include a

comparative analysis of the jury voir dire and the jury questionnaires of all venire members, not

just those venire members stricken."  Id. at * 2.  "'If a prosecutor's proferred reason for striking a

black panelist applies just as well to an otherwise-similar [footnote omitted] nonblack who is

permitted to serve, that is evidence tending to prove purposeful discrimination to be considered

at Batson's third step."  Id., quoting Miller-El v. Dretke, 545 U.S. 231, 241, 125 S.Ct. 2317

(2005).

"Further, the prosecutor is responsible for articulating his own reasons for the

challenges exercised."  Id.  "The Supreme Court has stressed that courts must be careful not to

substitute their own speculation as to reasons why a juror might have been struck for the

prosecutor's stated reasons."  Id.

During voir dire, the prosecutor began by observing to prospective juror Hubbard

that she had noted in his questionnaire that he had a Bachelor's degree in theology.  Reporter's

Augmented Transcript Volume I, p. at 185.

Prosecutor: Mr. Hubbard, good morning.

Hubbard: Good morning.

Prosecutor: I noted in your questionnaire, the first one you filled out, that you

have a Bachelor's degree in theology?

Hubbard: Yes.

Prosecutor: Can you tell us where did you go to school?

Hubbard: I went to Barber Bible Institute (ph) in Chicago, Illinois.

Prosecutor: Was that during your time with the armed forces?

Hubbard: That was after the armed forces.  As a matter of fact, I resigned to go to Bible school.

Prosecutor: Okay.  And was this a four-year university.

Hubbard: Yes, correct.

Prosecutor: Did it strictly–it was the major that you can get this only in theology or did they have it in other majors?

Hubbard: They had several other majors, yes.

Prosecutor: Did you pursue theology after you graduated?

Hubbard: Only in every day life, especially in thinking and serving.

Prosecutor: Did you ever become a minister of a church or assistant pastor of anything like that?

Hubbard: No, not in that name.  If I can assist in services, I will, such as whatever I am needed in the church, as far as helping out with maybe teaching Bible study or something like that.

Id. at 185-186.

Hubbard also stated that he had been in the military and now worked for the INS.

Id. at 186-187.  At the present time, he worked for the INS.  Id. at 6.  He stated that he believed

that he could listen fairly and impartially to the evidence.  Id.

After the prosecutor exercised a peremptory challenge as to prospective juror

Hubbard, defense counsel made a Wheeler motion[2].  Reporter's Augmented Transcript, Volume

II, at 8.  Defense counsel stated that Mr. Hubbard was the only African American in the whole

---

[2] A Wheeler motion is the California counterpart to a Batson motion.  People v. Wheeler, 22 Cal.3d 258, 148 Cal.Rptr. 890 (1978).

1  panel, indicated that he worked for the government and had been in the army.  Id.  She stated that

2  his answers to the questionnaire indicated that he could follow the law that was applicable to the

3  case.  Id.  Defense counsel stated that Hubbard said he had a degree in theology which he did not

4  use in his daily life except as to treat others fairly.  Id. at 8.

5          The court found that defense counsel had made a prima facie case of racial

6  discrimination.  Id. at 9.

7          The prosecutor then explained that she struck Hubbard based on her concerns

8  regarding his religious views:

9          Your Honor, I reviewed all the questionnaires from the jurors that we received
           before we actually saw them come into the courtroom.  And I went ahead and I
10         rated whether or not I would potentially keep or challenge the prospective juror
           just solely based on the questionnaire.  And I have notes, in case the Court would
11         like to view them.

12         In my review of the notes in Mr. Hubbard's situation, before Mr. Hubbard ever
           made it into the box, my notes indicate that I had a concern because he had a
13         bachelors degree in theology.

14         The concern to the People is that, and it has always been my position that people
           who are either ministers or who have spent a significant time studying
15         religion–and I think four years at a university to study religion is a significant
           amount of time–the People's concern, like I said, it's always been my concern that
16         people who devote that much time to their religion tend to be more sympathetic
           and want to be more forgiving and would be more emotional in deciding the case.
17         They would tend to want to forgive the defendant as opposed to being objective
           and looking at the facts.
18
           I also had a concern because I'd like the record to reflect that there is a Bible
19         sitting in front of the defendant.  So not only did I have a juror who had spent four
           years studying theology and religion, but I also have a defendant who has shown
20         symbolically to this jury that he is religious.  So, in that respect, I was concerned
           that Mr. Hubbard would feel, even given his background in theology, even more
21         sympathetic for the defendant.

22  Id. at 10-11.

23         Defense counsel then argued,

24         Well, your Honor, I point out a couple of things.

25         Mr. Taylor's Bible just says it's the Good News Bible.  It doesn't refer to any
           specific religion.  We don't know what religious beliefs Mr. Hubbard has.  I never
26         questioned him about them.  And, once again, he showed no indication that he

1        was going to be overly emotional or sympathetic.

2        This is a man who has been in combat in Vietnam and has done two tours of duty
         and did not appears to have any of the traits that Ms. Dozier is indicating she was
3        weary [sic] of.

4    Id. at 11.

5        The trial court then denied the Wheeler motion:

6        All right. For the record, which bears this out, but at least all of this information
         will be in one place for purposes of this motion.  Mr. Taylor is African American.
7        Mr. Hubbard is African American.

8        The Court has required the People to explain the reason for the peremptory
         challenge.  And I will make a finding that the concerns expressed by the
9        prosecutor do justify the exercise of the peremptory challenge.  It did not appear to
         be a challenge based on race.  There appear to be other factors which are credible
10       and which reflect tactical considerations which are permissible under the law.
         And so I'm going to deny the Wheeler motion.

11

12   Id. at 11-12.

13       In the pending motion for discovery, petitioner seeks all notes taken by the

14   prosecutor concerning voir dire, and not just the notes relating to Hubbard.  Petitioner contends

15   that in considering the totality of the circumstances, the court should consider whether the notes

16   reflect any differences in treatment due to race, and whether the notes reflect concerns with other

17   jurors' religious views.

18       If a petitioner "failed to develop the factual basis for a claim" in state court, the

19   federal court "shall not hold an evidentiary hearing on the claim" unless the petitioner can show

20   that one of two narrow statutory exceptions is applicable.  28 U.S.C. § 2254(d)(2).  A request to

21   expand the record with new documentary evidence that is intended to serve the same purpose as

22   an evidentiary hearing is subject to this same rule.  Cooper-Smith v. Palmateer, 397 F.3d 1236,

23   1241 (9th Cir. 2005); Holland v. Jackson, 542 U.S. 649, 652, 124 S.Ct. 2736 (2004).  The Ninth

24   Circuit has not yet decided whether requests for discovery fall within the ambit of § 2254(e)(2).

25   However, the reasoning of Cooper-Smith and Holland is equally applicable to discovery requests

26   as they are designed to develop evidence on the merits of a claim.

1        If a petitioner "failed to develop the factual basis for a claim" in state court, the

2   federal court "shall not hold an evidentiary hearing on the claim" unless the petitioner can show

3   that one of two narrow exceptions is applicable.  28 U.S.C. § 2254(e)(2).  Whether a petitioner

4   failed to develop a claim in state court turns on whether the petitioner exhibited a lack of

5   diligence or some greater fault in state court.  Williams v. Taylor, 529 U.S. 420, 421, 120 S.Ct.

6   1479 (2000).  Ordinary diligence requires that petitioner seek an evidentiary hearing in state court

7   in the manner prescribed by state law.  Williams v. Taylor, 529 U.S. 420, 437, 120 S.Ct. 1479

8   (2000).  Under California law, an appellate court, when presented with a state habeas petition,

9   determines whether an evidentiary hearing is warranted only after the parties file formal

10  pleadings, if they are ordered to do so.  Horton v. Mayle, 408 F.3d 570, 582 n.6 (9th Cir. 2005).

11  If the state court denies the petition without ordering formal pleadings, the case never reaches the

12  stage where an evidentiary hearing/discovery must be requested and the petitioner's failure to

13  request a hearing in state court does not trigger § 2254(e)(2).  Id.

14       In the instant case, petitioner requested an evidentiary hearing in his habeas

15  corpus petition filed in the California Supreme Court.  See Exhibit A attached to petitioner's

16  reply to respondent's opposition to motion for discovery.  The California Supreme Court denied

17  petitioner's state habeas petition raising the at-issue claim without ordering formal pleadings.

18  Because petitioner did not reach the stage of the proceedings at which an evidentiary

19  hearing/discovery should be requested, he has not shown a lack of diligence at the relevant stages

20  of the state court proceedings and is not subject to the restrictions set forth in § 2254(e)(2).

21       Accordingly, although petitioner's habeas petition is governed by the Anti-

22  Terrorism and Effective Death Penalty Act (AEDPA), which limits a district court's discretion in

23  conducting evidentiary hearings and discovery, see 28 U.S.C. § 2254(e)(2), this court assesses

24  the availability of an evidentiary hearing/discovery under pre-AEDPA law because petitioner

25  exercised sufficient diligence in seeking to develop the factual basis of his claim in state court.

26  Wiliams v. Taylor, 529 U.S. 420, 437, 120 S.Ct. 1479 (2000).

1    "Under pre-AEDPA law, a habeas petition is entitled to an evidentiary hearing

2   [and discovery] on a claim where the facts are in dispute if 1) he has alleged facts that, if proven

3   would entitle him to relief; and 2) he did not receive a full and fair evidentiary hearing in state

4   court." See Silva v. Calderon, 279 F.3d 825, 853 (9th Cir. 2002).

5    In Schriro v. Landrigan, ___ U.S. ___, 127 S.Ct. 1933, 1940 (2007), the Supreme

6   Court recently added another consideration in granting evidentiary hearings.  The Supreme Court

7   held that "[b]ecause the deferential standards prescribed by § 2254 control whether to grant

8   habeas relief, a federal court must take into account those standards in deciding whether an

9   evidentiary hearing is appropriate."  127 S.Ct. at 1940.  Accordingly, "[i]t follows that if the

10   record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district

11   court is not required to hold an evidentiary hearing."  Id.

12    However, Landrigan also recognized that "[i]n cases where an applicant for

13   federal relief is not barred from obtaining an evidentiary hearing under § 2254(e)(2), the decision

14   to grant such a hearing rests in the discretion of the district court.  Id. at 1937.  This is so because

15   AEDPA "has not changed" the "basic rule" from before the enactment of AEDPA that "the

16   decision to grant an evidentiary hearing was generally left to the sound discretion of district

17   courts."  Id. at 1939.

18    In the instant case, petitioner did not receive an evidentiary hearing or discovery

19   as to the at-issue claim.  Accordingly, the court next considers whether petitioner has alleged

20   facts which, if proven, would entitled him to relief and, pursuant to Landrigan, whether the

21   record refutes his allegations or precludes relief.

22    Based on the record, the court does not find that the trial court in this case failed

23   to undertake a sensitive inquiry into such circumstantial and direct evidence of intent as was

24   available.  Green, supra.  The trial court's finding that the prosecutor's motive was race-neutral

25   and not a pretext for racial discrimination is supported by the record.  Petitioner does not argue

26   that the record before the trial court contained any evidence suggesting that the prosecutor failed

20

1 to strike white jurors based on their religious views.  See Green, supra, (the Ninth Circuit cited

2 portions of the voir dire demonstrating that the prosecutor failed to strike white jurors with

3 similar backgrounds to the stricken African American juror).  Petitioner does not argue, for

4 example, that the questionnaires of any white jurors indicated a religious background similar to

5 that of Mr. Hubbard.[3]

6           In addition, the prosecutor's reason for striking Mr. Hubbard was supported by the

7 record.  In other words, the facts in the record were not objectively contrary to the prosecutors

8 reason for striking him.  See McClain v. Prunty, 217 F.3d 1209, 1221 (9th Cir. 2000) ("Where

9 the facts in the record are objectively contrary to the prosecutor's statements, serious questions

10 about the legitimacy of a prosecutor's reasons for exercising peremptory challenges are raised.")

11 In fact, the first questions the prosecutor asked Mr. Hubbard concerned his religious background.

12           Because the direct and circumstantial evidence cited above supported the

13 prosecutor's race neutral reason for striking Mr. Hubbard, the trial court was not required to look

14 further than it did in evaluating petitioner's Wheeler motion.  In other words, the circumstances

15 did not require the trial court to review the prosecutor's notes on the jury questionnaires.  "The

16 trial judge had the unique opportunity to observe the demeanor of the prosecutor as [s]he justified

17 the peremptory strike, as well as [Mr. Hubbard] as [he] interacted with counsel during voir dire."

18 Williams v. Rhodes, 354 F.3d 1101, 1109 (9th Cir. 2004).   For these reasons, petitioner's Batson

19 racial claim as to Mr. Hubbard is without merit.

20           Because the record precludes habeas relief, petitioner is not entitled to discovery

21 as to this claim.  The court also will not exercise its discretion to permit the requested discovery.

22 Because the denial of this claim by the California Supreme Court was not an unreasonable

23 application of clearly established authority, this claim should be denied.

24

_____

25        [3] In the pending discovery motion, petitioner seeks only the prosecutor's notes from the
jury questionnaires.  Because the motion does expressly request the questionnaires, the court
26 presumes that petitioner's counsel has access to them.

1    Turning to potential juror Mr. Wade, during voir dire petitioner's counsel asked

2  him regarding the burden of proof in a criminal case:

> Defense counsel: And you indicated on your questionnaire, that you felt that you would require more in a murder case than any other type of criminal offense?
>
> Wade: There would have to be definite proof.
>
> Defense counsel: What I need to ask you is their burden is beyond a reasonable doubt.  The law does not allow any jury to find a person guilty with less proof and does not allow jurors to require more than the law does.
>
> Now, his Honor will later explain exactly what the law is of reasonable doubt. Once he does that, will you be able to follow the law and only hold them to their burden and not require some?
>
> Wade: I would be able to pull it along, but this is within my interpretation.
>
> Defense Counsel: Sometimes we feel that we do one thing rather than another. The law says we only can do one thing.
>
> Wade: Correct.
>
> Defense Counsel: Are you going to be able to set aside what you like it to be and what your personal feelings are as a standard of proof and follow the law?
>
> Wade: Well, yeah, I follow the law, as I understand it.

16  Reporter's Augmented Transcript, Volume II, pp. 15-16.

17    The prosecutor asked Mr. Wade about his views concerning domestic violence

18  and the standard of proof:

> Prosecutor: Mr. Wade, good afternoon.
>
> Wade: Good afternoon.
>
> Prosecutor: I had a similar question as the one that I talked with Mr. Breen about that, is that alternative prospective juror Number 19, that is, with your opinion with respect to domestic violence cases should be handled in criminal court.
>
> Wade: Well, I don't think all of them should be.  Because it's different, and what you are doing is actually putting a tag on somebody.
>
> Prosecutor: What do you mean, putting a tag?
>
> Wade: You are making a criminal out of him for a minor offense.

Prosecutor: Okay.  In your mind what would you define as being minor?

Wade: Well, arguments between a spouse.

Prosecutor: Uh-huh?

Wade: Nobody gets hurt.  They are just talking back and forth and causing a little commotion.  Police comes in, they take somebody to jail.

Prosecutor: As I explained to Mr. Breen, and so just so I can ask you if your opinion is the same in order to be brought to criminal court, there has to be as assault, so a hit?

Wade: Oh.

Prosecutor: Okay.  There has been an assault.  Arguing, that happens all the time.  So that's not criminal conduct.  It has to be an assault, some kind of blow, slap, that kind of thing.  Does that change, do you believe, those types of cases?

Wade: Not all of them, because there are different degrees.  And somebody may grab somebody and somebody may touch somebody, that's considered an assault.

Prosecutor: Okay.  So would you agree with Mr. Breen that could be handled more properly in family court?

Wade: Rehabilitation would be the best thing, counseling, rehabilitation, family court, anything but give them a criminal record.

Prosecutor: Your niece's husband who was a Captain at the Harrisburg Police Department?

Wade: Yes.

Prosecutor: Is he currently.

Wade: No, he's retired.

Prosecutor: Did you have much contact with him when he was?

Wade: No.

Prosecutor: A captain?

Wade: No.

Prosecutor: What about the question I've been asking whether or not I think Mr. Odbert touched on it, whether on a murder case you would require more proof than proof beyond a reasonable doubt?

Wade: I would require definite proof, yes, in order to convict somebody of murder.

23

Prosecutor: Right, proof beyond a reasonable doubt there has to be a presentation or evidence?

Wade: Right.

Prosecutor: A lot of evidence, and then the jury deliberates and they have to decide whether that evidence proves beyond a reasonable doubt.  So a juror cannot have a reasonable doubt and convict, you see what I am saying?  If a juror has a reasonable doubt, they have to acquit.

Wade: Right, if I have a reasonable doubt, then that's the way I would vote.

Prosecutor: The instruction is not that it's any doubt.  I don't have to prove doubt, any doubt.  It's there is like it doesn't have to be one hundred percent.  Just reasonable, you agree with that?

Wade: I can agree with that.

Prosecutor: Okay.  Let me ask you, you talk about some family members that have been charged with crimes?

Wade: Sure.

Prosecutor: And without going into it, do you believe that the system treated these individuals fairly?

Wade: Well, they were guilty.  Let me put it that way, what they were convicted of.  But whether the system treats them fairly, treats everybody, fairly, no I don't believe that.

Prosecutor: What do you mean?

Wade: In other words, I believe the system warehouses people more than they are trying to rehabilitate them.

Id. at 17-20.

After the prosecutor exercised a peremptory challenge as to potential juror Mr. Wade, defense counsel made a Wheeler motion.  Id. at 22-24.  The trial court found that a prima facie case of discrimination had been made.  Id. at 24.  The prosecutor then explained why she had excused Mr. Wade:

So in the entire panel of jurors who were ultimately questioned, Mr. Wade happened to be the only African-American.

He stated initially in his questionnaire that he would require more proof.  Upon further questioning, though he did resolve that he would follow the law with proof

24

1    beyond a reasonable doubt.

2    The People's concerns arose in two areas.  The first being not a[s] significant as
     the second area. The first area of concern though was his feelings about domestic
3    violence and what it boils down to, he, as he felt even in minor cases of assault,
     those belonged in family court and shouldn't be in criminal court.  And if I
4    remember correctly, he stated he didn't think somebody should be "tagged" as a
     criminal.  He did use the term "tagged," put a tag on somebody.
5    The biggest concern was when I talked with him about his relatives and he has a
     brother, a nephew and he's put down "cousins" in the plural, his questionnaire,
6    that being question number 13 on page four, they were convicted of possession of
     drugs.
7
     When I asked him if he felt that the system treated those individuals fairly, he said
8    he didn't think they should be serving time.  He used the word they shouldn't be
     "warehoused."  He didn't believe they should be going to prison.  There has not
9    been a single juror in this panel, that is on the jury or a single person we
     questioned who has ever brought up a concern about a person being in jail.
10   Almost of everybody who has had a relative who has been involved or been
     charged with a crime and convicted had no problem with the way it was resolved,
11   that the person either served jail time; but Mr. Wade used the ward "warehoused."
     He felt it would be better for all of these individuals, we are talking four family
12   members, to be rehabilitated.

13   My concern is that Mr. Wade would not want to quote, "tag" the defendant as a
     criminal, would not want to see him "warehoused" and will be more concerned
14   with his being rehabilitated.

15   Id. at 24-26.

16   Petitioner's counsel argued in reply:

17   Yes, your Honor.  I'd like to place on the record that Mr. Wade was referring to
     cousins who had been convicted of narcotics offenses, not any assaultive
18   behavior.

19   And he wasn't asked about specifically do you think people who are convicted of
     murder should be sent to jail or to rehabilitation.  I think he was purposefully not
20   asked that.  I mean it's a thought process that people who are convicted of drug
     offenses can be rehabilitated.  That's why we passed Proposition 36, because it is
21   a common way of thinking because it is the truth, not all drug offenders need to be
     "warehoused."  And I believe that that's what Mr. Wade was referring to and is
22   referring to his cousins' offense, which is a drug offense, and he was being honest.
     And he was not saying that he didn't feel that other persons are convicted of other
23   types of crime should all need rehabilitation.  He indicated some people should do
     time.  That's what I heard him say.
24

25   Id. at 26-27.

26   \\\\\

                                          25

The prosecutor responded,

> Well, I think that's an inference that could be drawn from what he said, that he thinks only drug offenders should be "warehoused" because he did say when discussing whether or not a domestic violence assault belongs in criminal courts, he said I don't think everybody who is involved in minor domestic violence assaults should be quote "tagged" a criminal. That concerned me greatly.

Id., p. 27.

The court denied the Wheeler motion:

> In considering this motion, I've gone through all of the questionnaires of all of the jurors who remain in the box. There are eleven of them, and all of them have given what is the legally correct answer to question 26 on page 8, "Would you require either more or less proof to convict someone of murder than what you would require if the charge were something else?" They have all stated in one way or another that they would not or it's all the same.

> And that is at odds with Mr. Wade's initial statement. But everyone else who has expressed some reservations about the burden of proof has been excused by one side or the other.

> Insofar as the prosecution's exercise of challenges, which is the subject of this inquiry and the scrutiny, Mr. Wade's attitude on domestic violence is different than what the law is. His attitude toward punishment is different than what the law is. His feelings about rehabilitation, particularly, given the facts and circumstances of this case, I think it's reasonable to assume that they could come into play and make it difficult for him to find that the burden of proof had been met if, in fact, other jurors are going to find that it has been.

> And so I think those provide a sufficient race neutral basis for exercise of the challenge. And so I will deny the Wheeler motion as to Mr. Wade.

> And, also, I think I need to make a finding that insofar as Mr. Wade and I believe the other gentleman is Mr. Hubbard, that this does not show a pattern that adequate explanations have been given for each challenge. So a pattern has not been established. So the Wheeler motion is denied.

Id. at 29-31.

Based on the record, the court does not find that the trial court in this case failed to undertake a sensitive inquiry into such circumstantial and direct evidence of intent as was available regarding the Wheeler challenge to potential juror Wade. Green, supra. The trial court's finding that the prosecutor's race neutral reason was not a pretext for discrimination was supported by the record. The trial court reviewed the jury questionnaires and found that the

1  jurors left in the jury box had indicated that they would apply the correct standard of proof, in

2  contrast to Mr. Wade's suggestion that he might require more proof.  The trial court also found

3  that everyone else who had expressed reservations about the burden of proof had also been

4  dismissed.  Petitioner does not argue that these findings by the trial court were incorrect.

5          In addition, the prosecutor's reason for striking Wade was supported by the

6  record.  In other words, the facts in the record were not objectively contrary to the prosecutors

7  reason for striking him.  See McClain v. Prunty, supra.

8          After independently reviewing the record, the court finds that the denial of this

9  claim by the California Supreme Court was not an unreasonable application of clearly established

10  authority, his motion for discovery is denied.  For the same reasons, this claim should be denied.

11          D.  Claim 4: Jury Instruction Error

12          Petitioner argues that the trial court should have sua sponte given CALJIC 3.40

13  defining proximate cause. The California Court of Appeal denied this claim for the following

14  reasons:

15          Defendant contends the trial court erroneously instructed on causation.
        The trial court gave the following instructions on causation:
16          "[CALJIC No.] 8.55 [:] To constitute murder or manslaughter there must be, in
        addition to the death of a human being, an unlawful act which was a cause of that
17          death.

18          "[CALJIC No.] 8.56 [:] It is not a defense to a criminal charge that the deceased
        or some other person was guilty of negligence, which was a contributory cause of
19          the death involved in this case.

20          "[CALJIC No.] 8.57[:] Where the original injury is a cause of the death, the fact
        that the immediate cause of death was the medical or surgical treatment
21          administered or that the treatment was a factor contributing to the cause of death
        will not relieve the person who inflicted the original injury from responsibility.

22
        "Where, however, the original injury is not a cause of the death and the death was
23          caused by medical or surgical treatment or some other cause, then the defendant is
        not guilty of an unlawful homicide."

24
        Defendant does not criticize these instructions.  Rather, he argues that the trial
25          court should have instructed with CALJIC No. 3.40 so as to further define
        proximate cause. [Footnote 5]

26

[Footnote 5: CALJIC No. 3.40 provides in part: "The criminal law has its own particular way of defining cause.  A cause of [death] is an act...that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act...the [death,] and without which the [death] would not occur."]

Defendants' argument is therefore that each proximate cause instruction actually given was incomplete because it did not adequately define proximate cause. However, as defendant acknowledges, CALJIC 3.40 was originally requested but was withdrawn.  The record does not reveal which party requested it, or why it was withdrawn.  A party contending that an instruction that is otherwise correct [sic] is incomplete has a duty to object to the instructions given or request a clarifying instruction in the trial court; otherwise, the claim is forfeited on appeal. (People v. Valdez (2004) 32 Cal.4th 73, 113; People v. Hart (1999) 20 Cal.4th 546, 622.)  Because the record fails to show that defendant objected to the causation instructions given or requested a clarifying instruction, his claim of instruction error has been forfeited.  (People v. Valdez, supra, 32 Cal.4th at p. 113.)

Opinion of California Court of Appeal, pp. 16-18.

Respondent argues that this claim is procedurally barred for the reasons stated by the California Court of Appeal above, i.e. his failure to request this instruction.  Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.Ct. 2590 (1991) (applying the look through doctrine).

Petitioner has not met his burden of challenging the adequacy of the bar discussed by the California Court of Appeal by showing it is inconsistently applied.  Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003).  In the reply to the answer, petitioner argues that the court should disregard respondent's claim that the issues are forfeited due to counsel's failure to object to the instructions. Reply, p. 4: 16-18.  Petitioner argues that respondent has not met his burden under Bennett, supra.  Id.  The court disagrees.  Respondent met his burden under Bennett by pleading petitioner's failure to satisfy a state procedural bar.  322 F.3d at 586.

If there is an independent and adequate state ground for the decision, the federal court may still consider the claim if the petitioner demonstrates:  (1) cause for the default and actual prejudice resulting from the alleged violation of federal law, or (2) a fundamental miscarriage of justice.  Harris, 489 U.S. at 262, 109 S. Ct. at 1043.

\\\\\

In order to evaluate whether petitioner was prejudiced by the trial court's failure to read the proximate cause instruction sua sponte the court will discuss the evidence presented regarding the cause of Marcel's death.

The California Court of Appeal found that there was sufficient evidence that petitioner caused Marcel's death:

> Defendant contends there was insufficient evidence to support his conviction for murder because the People failed to prove defendant's conduct caused Marcel's death, which occurred due to "natural causes ... nearly one month after he was born." We conclude there is sufficient evidence that defendant's conduct caused Marcel's death.

> We review insufficient-evidence contentions in criminal cases by viewing the evidence in the light most favorable to the judgment and deciding whether there is substantial evidence from which a reasonable trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. ( People v. Staten (2000) 24 Cal.4th 434, 460, 101 Cal.Rptr.2d 213, 11 P.3d 968; People v. Johnson (1980) 26 Cal.3d 557, 576, 162 Cal.Rptr. 431, 606 P.2d 738.) If the answer is affirmative, the possibility that the trier of fact might reasonably have reached a different conclusion does not warrant reversal. ( People v. Bean (1988) 46 Cal.3d 919, 932-933, 251 Cal.Rptr. 467, 760 P.2d 996.)

> "The criminal law ... is clear that for liability to be found, the cause of the harm not only must be direct, but also not so remote as to fail to constitute the natural and probable consequence of the defendant's act." ( People v. Roberts (1992) 2 Cal.4th 271, 319, 6 Cal.Rptr.2d 276, 826 P.2d 274.) In determining whether a defendant's acts were the proximate cause of the death of a human being, we ask whether the evidence sufficed to permit the jury to conclude that the death was the natural and probable consequence of defendant's act. ( Id. at p. 321, 6 Cal.Rptr.2d 276, 826 P.2d 274.) As we shall explain, the evidence adduced at the trial of this case satisfies this test.

> Defendant points to the evidence that medical science does not know for certain what causes necrotizing intercolitis, that the condition can occur in full-term babies, that it is less likely to occur fatally in babies born at 28 weeks than in those born two or three weeks younger, and that Marcel's Down's syndrome-related heart defect carried a measurable risk of mortality even if he had been delivered at term.

> Although defendant does not fully spell it out, we take his argument to be that Marcel's preexisting heart defect could have been the sole cause of death because it rendered him vulnerable to necrotizing intercolitis regardless of the circumstances of his birth, and that the prosecution did not prove the contrary beyond a reasonable doubt. Defendant cannot hope to prevail merely by arguing the heart defect was a contributing cause of death: even if true, this claim would not relieve him of responsibility for his own acts. (See People v. Phillips (1966) 64 Cal.2d 574, 577-579, 51 Cal.Rptr. 225, 414 P.2d 353; People v. Scola (1976)

56 Cal.App.3d 723, 726, 128 Cal.Rptr. 477.)

Contrary to defendant's position, the jury here could reasonably have concluded that Marcel's death was the natural and probable consequence of defendant's punching Garvon White. It was undisputed that defendant's assault on White forced the immediate and grossly premature delivery of Marcel. It was also undisputed that from the time of his birth to the time of his death, Marcel suffered from debilitating conditions caused by his prematurity and which would not have existed but for the prematurity. The immediate cause of Marcel's death, necrotizing intercolitis, is almost never seen except in premature babies. Dr. Ezzedeen, the main prosecution expert on that point, had seen over 100 cases, but not one in a baby born at full term.FN4 Dr. Ezzedeen and Dr. Reiber explained how the many forms of vulnerability a premature infant experiences can expose him to necrotizing intercolitis. Dr. Reiber also testified to other forms of injury Marcel had incurred before his death arising out of those same vulnerabilities. Altogether, this evidence constituted an overwhelming showing that defendant's assault on White was the proximate cause of Marcel's death.

> FN4. Defendant cites the testimony of Dr. Reiber, the forensic pathologist, that the condition can happen in full-term infants. Dr. Reiber gave no evidence as to the probability or frequency of such an occurrence, however. Thus his testimony did not contradict that of Dr. Ezzedeen.

On the other hand, there was no substantial evidence to support the claim that Marcel's heart defect would have caused his death if he had not been born almost two months prematurely. Although there was evidence that it would have increased his risk of mortality by a small percentage if he had been born at full term, there was no evidence that it would have increased his risk of developing necrotizing intercolitis under those circumstances. There was only the skimpiest evidence that full-term babies can develop that condition (an undeveloped allusion to the medical literature, with no showing as to probability or frequency). And there was no evidence whatever that any full-term baby has ever died of that condition.

But even if the jury could have concluded that Marcel's preexisting heart defect contributed to his death, that would not have relieved defendant of his responsibility for the death. As the courts have made clear, a defendant whose infliction of physical injury upon another is a cause of that person's death is guilty of unlawful homicide even if the injury was not the only cause of death, and even if the victim was in a weakened state due to a preexisting condition. ( People v. Phillips, supra, 64 Cal.2d at pp. 577-579, 51 Cal.Rptr. 225, 414 P.2d 353; People v. Stamp (1969) 2 Cal.App.3d 203, 207-209, 82 Cal.Rptr. 598; see CALJIC No. 8.58.) Although the first victim of physical injury from defendant's act was Garvon White, Marcel was the ultimate victim of that injury, in that the premature delivery it forced rendered him vulnerable to the condition that killed him.

Substantial evidence supports the jury's conclusion that defendant caused the death of Marcel Taylor.

Opinion of California Court of Appeal, pp. 12-16.

1    This court has also reviewed the record and will set forth some of the relevant

2 testimony regarding causation.  Dr. Ezzedeen, the neonatologist at Sutter Memorial Hospital who

3 cared for Marcel, testified that Marcel developed necrotizing intercolitis (NEC).  RT at 427.  In

4 his practice, NEC was more common in premature babies, like Marcel.  RT at 438.  Prematurity

5 was the most important risk factor for NEC.  RT at 439.   Dr. Ezzedeen testified that Marcel's

6 other complications, i.e. Down's syndrom and his heart defect, were not directly related to his

7 death.  RT at 439-440.  He testified that, "I suppose it could carry some risk factors in the

8 development of NEC, but it is not a type of heart defect that is known to cause selectively

9 decreased blood flow to the intestinal tract."  Id.  He also testified that had Marcel been born at

10 term,

11     Well, basically, he would not have the breathing problems that he had due to his

12     lung immaturity.  That's one thing that can be probably not to worry about had he
born term.

13     Second, the management of his heart problems would have been a little bit easier.

14     Third, NEC is extremely uncommon in term babies.  If you add these factors, you
know, one can speculate maybe management would have been a lot easier for his

15     Down's and heart condition had he been born term.

16 RT at 440.

17    On cross-examination, Dr. Ezzedeen testified that one could not really exclude

18 that Marcel's heart problem was a risk factor for the development of NEC.  RT at 445.  On re-

19 direct he went on to testify:

20     Q: So would baby–I mean, given what you know about his heart defect, if he had
been born to term, would he have been at a risk for NEC?

21

22     Petitioner's Counsel: Objection; calls for speculation.

23     Court: Overruled.  You can answer.

24     A: It would be a far greater, far lower risk for NEC, significantly lower.

25     Q: Significantly lower risk?

     A: But theoretically, it's possible.

26 RT at 464.

1    Dr. Reiber, the doctor who performed the autopsy of Marcel, testified that he died

2 "basically as a result of complications of prematurity and with a complicating factor of a

3 congenital heart defect known as common atrial ventricular canal." RT at 471.  But, "ultimately

4 he died as a result of infectious complication of necrotizing intercolitis." RT at 482.  When asked

5 whether Marcel's heart defect had any direct role in his death, Dr. Reiber testified,

6       I don't know I would say direct.  I think it played a role in increasing his risk for
        various complications of his prematurity, including the necrotizing intercolitis.
7       But I think by itself would not have caused his death.

8 RT at 482.

9    When asked if Marcel would have lived had he been born to term with the

10 Down's syndrome and its linked congenital heart defect, Dr. Reiber answered,

11      I think his chances would have been very good.  This particular type of heart
        defect is not associated with a high mortality rate in and of itself.  The mortality
12      rate is probably in the five to six percent range for this particular problem.  And so
        his chances of survival would have been very high.
13

14 RT at 484.

15      Dr. Reiber testified that the "proximate cause" of Marcel's death was NEC:

16      Q: Doctor, Marcel didn't die from prematurity, he died from the complications of
        necrotizing intercolitis, did he not?
17
        A: Well, in terms of an immediate cause of death, yes.  But, in my opinion, his
18      proximate cause, proximate cause of death goes back to the prematurity, a primary
        factor leading to the NEC.
19

20 RT at 484.

21      Petitioner suggests, as did his counsel at trial, that Marcel's heart defect

22 contributed to if not caused his death, rather than his premature birth caused by petitioner.

23 However, it is clear from the testimony of Dr. Ezzedeen and Dr. Reiber that Marcel died from

24 NCS, caused by his premature birth.  Dr. Ezzedeen testified that Marcel's heart disease was not

25 the type of heart defect known to cause selectively decreased blood flow to the intestinal tract,

26 thus leading to NCS.  Dr. Reiber testified that had Marcel been born to term, his chance of

1    survival, despite his heart defect, was very good.

2          CALJIC No. 3.40 provides that, "a cause of [death] is an act...that sets in motion a

3    chain of events that produces as a direct, natural and probable consequence of the act...the

4    [death,] and without which the [death] would not occur."  Based on the reasoning of the

5    California Court of Appeal and the testimony set forth above, this court finds that there was more

6    than sufficient evidence that petitioner proximately caused the death of Marcel.  For this reason,

7    petitioner was not prejudiced by the trial court's failure to read this instruction sua sponte.  Nor

8    did any violation of fundamental fairness occur as a result of the failure to read this instruction.

9    Accordingly, this claim should be denied as procedurally barred.

10          E.  Claim 5: Jury Instruction Error

11          Petitioner alleges that the trial court erroneously gave CALJIC 8.51.  The

12    California Court of Appeal denied this claim for the following reasons:

13          Defendant contends the trial court erred by instructing the jury pursuant to
      CALJIC No. 8.51: "If a person causes another's death while committing a felony
14    which is dangerous to human life, the crime is murder.  If a person causes
      another's death while committing a felony that is not inherently dangerous, but
15    which is dangerous to human life under the circumstances of its commission, the
      crime is involuntary manslaughter."  According to defendant, this instruction,
16    which differentiates between second degree felony murder liability is not an issue
      because it erroneously permits the jury to find guilt based on a felony murder
17    theory rather than a finding of malice.  Defendant further contends that the trial
      court's error must be reviewed under the Chapman [footnote] standard because it
18    withdrew the issue of malice, an essential element

19          [footnote: Chapman v. California (1967) 386 U.S. 18 [17 L.Ed.2d 705]
      (Chapman).]
20
      of murder, from the jury's consideration, or because it set up a conflict with other
21    instructions going to that issue.  (See People v. Maurer (1995) 32 Cal.App.4th
      1121, 1128.)  Defendant has not shown grounds for reversal on this point.
22
      CALJIC No. 8.51 should not be given in a second degree felony murder
23    prosecution in which the felony has "merge[d]" with the homicide."  (See People
      v. Hansen (1994) 9 Cal.4th 300, 316.)  However, as we shall explain, this case
24    was not prosecuted as a felony murder case, and the jury could not reasonably
      have believed that it could convict defendant on a felony murder theory.  Thus,
25    even assuming the instruction should not have been given, the error is harmless
      under the Chapman standard.
26

The information alleged as to count 1 that defendant committed murder, acting with malice aforethought.  The jury was correctly instructed on the definitions of murder and malice aforethought (CALJIC Nos. 8.10, 8.11); the various forms of unlawful homicide, not including felony murder (CALJIC Nos. 8.20, 8.30, 8.31, 8.37, 8.40, 8.42, 8.43, 8.44, 8.45, 8.46, 8.50); and the concurrence of act and specific intent as to count 1 (CALJIC No. 3.11).

Moreover, the jury heard the testimony of Garvon White and the numerous witnesses to whom she had told her story before trial that defendant said, as he punched her multiple times in the stomach, that he did not want the baby and did not want White to have the baby, and/or that he wanted to kill the baby–evidence fitting only a theory of malice aforethought.  The prosecutor stressed this testimony in closing argument:

"We submit to you, ladies and gentlemen, that the most accurate statements from Garvon White occurred before she began her attempt to protect him.  So what statements are those?  Those are the statements to the responding officer, Officer Benton, who she tells, he hit me six times in the stomach, said he didn't want me to have his baby.  She told the paramedic that he hit her multiple times in the stomach...To Dr. Wong, again, she said multiple times she was hit to the stomach.  To Alisa Kistler, that she was hit six times to the stomach.  And to the social worker, Laura Barman Murray, [to] who[m] she explained he said he wanted to kill my baby. [¶]...[¶]...She told Detective Rankin the defendant hit her six times in the stomach while she was on the floor trying to protect the baby.  He yelled as he hit her, I don't want the baby, don't want the, quote, 'bitch,' to have this baby."

The prosecutor also clearly explained the difference between murder and manslaughter–the presence or absence of malice aforethought–and the reasons why defendant could not properly be found to have committed the lesser of these offenses: the number and force of the blows he struck and the words he spoke as he struck them, showing an intent to kill or a conscious disergard for life plus an action naturally dangerous to the life of the ultimate victim, combined with a lack of any legally sufficient provocation and heat of passion or unreasonable self-defense to reduce the offense to manslaughter.  The prosecutor never argued for second degree murder on a felony murder theory.

Furthermore, there was no evidence that the assault took place in any way other than that which White described before and during trial: a targeted attack on the fetus, accompanied by outbursts of murderous rage toward it (along with the "bitch" who was carrying it.)  The jury could not reasonably have found that defendant merely beat White without intending the fatal result that ultimately followed.

For all these reasons, even if the trial court should not have given CALJIC 8.51, there is no reasonable possibility that defendant would have obtained a better outcome without that instruction.  Therefore, any error was harmless beyond a reasonable doubt.  (Chapman, supra, 386 U.S. 18, 24, [17 L.Ed.2d at pp. 710-711].)

Opinion of California Court of Appeal, pp. 27-30.

1        After finding that the trial court erred in giving CALJIC No. 8.51, the California

2  Court of Appeal found the error to be harmless, applying the standard set forth in <u>Chapman v.</u>

3  <u>California</u>, 386 U.S. 18, 24, 87 S.Ct. 824 (1967).

4        For the reasons stated by the California Court of Appeal, this court finds that the

5  state appellate court's finding that the trial court erred in giving CALJIC No. 8.51 was not an

6  unreasonable application of clearly established Supreme Court authority.  However, this court

7  must still determine whether the error was harmless within the meaning of <u>Brecht v.</u>

8  <u>Abrahamson</u>, 507 U.S. 619, 113 S.Ct. 1710 (1993).  <u>Fry v. Pliler</u>, ___ U.S. ___, 127 S.Ct. 2321,

9  2327-28 (2007) (noting that AEDPA "sets forth a precondition to the grant of habeas relief..., not

10  an entitlement to it," and that "in § 2254 proceedings a [federal] court must assess the prejudicial

11  impact of constitutional error in a state-court criminal trial under the 'substantial and injurious

12  effect' standard set forth in <u>Brecht</u>").  "<u>Brecht</u> applies "whether or not the state appellate court

13  recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable

14  doubt' standard set forth in <u>Chapman</u>."  <u>Id.</u> at 2328.

15           In other words, a federal habeas court technically applies <u>Brecht</u> in light of
            AEDPA, but because the <u>Brecht</u> test is stricter (i.e., tougher on the petitioner) than

16          AEDPA/<u>Chapman</u>, any petitioner that meets the <u>Brecht</u> standard will necessarily
            meet the AEDPA/<u>Chapman</u> standard.  Thus, when conducting harmless-error

17          review, we simply apply the <u>Brecht</u> standard and ask whether [the petitioner] has
            shown that the error had substantial and injurious effect in determining the jury's

18          verdict.

19  <u>Wilson v. Mitchell</u>, 498 F.3d 491, 503 (6th Cir. 2007).

20        Based on the reasoning of the California Court of Appeal, this court finds that the

21  reading of CALJIC 8.51 did not have a substantial and injurious effect on the jury's verdict.

22  Accordingly, this claim should be denied.

23        F.  <u>Claim 6:  Batson</u>

24        Petitioner argues that the prosecutor's challenge to prospective juror Hubbard

25  based on his religious affiliation violated <u>Batson v. Kentucky</u>, <u>supra</u>.  The California Court of

26  Appeal found that this claim was barred because petitioner did not raise this argument at trial.

1  Opinion of California Court of Appeal, pp. 21-22.  Respondent argues that this claim is

2  procedurally barred for the reasons stated by the California Court of Appeal above.  Ylst v.

3  Nunnemaker, 501 U.S. 797, 803, 111 S.Ct. 2590 (1991).

4          After reviewing the traverse, the court finds that petitioner has not met his burden

5  of challenging the adequacy of the bar discussed by the California Court of Appeal by showing it

6  is inconsistently applied.  Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003).  The court also

7  finds that petitioner has not demonstrated cause for the default and actual prejudice resulting

8  from the alleged violation of federal law, or a fundamental miscarriage of justice.  Harris, 489

9  U.S. at 262, 109 S. Ct. at 1043.  This is because the United States Supreme Court has not

10  extended Batson to challenges based on religion, or even specific religious affiliation.

11          We have never held that Batson applies to cases of religious discrimination in jury
            selection. [FN3]  Even assuming, arguendo, that Batson does apply to claims of
12          religious discrimination, we find no clear error in the district court's action. It is
            therefore unnecessary to resolve the open question of whether Batson does indeed
13          apply to religious discrimination.

14          FN3. The Supreme Court has so far declined to resolve this issue. See Davis v.
            Minnesota, 511 U.S. 1115, 1115, 114 S.Ct. 2120, 128 L.Ed.2d 679 (1994) (denial
15          of certiorari in a case raising the issue). Some courts have made the distinction
            between one's religious affiliation and one's religious beliefs. See United States v.
16          Brown, 352 F.3d 654, 669 (2d Cir.2003); United States v. DeJesus, 347 F.3d 500,
            511 (3d Cir.2003) ( "The distinction drawn by the District Court between a strike
17          motivated by religious beliefs and one motivated by religious affiliation is valid
            and proper."); United States v. Stafford, 136 F.3d 1109, 1114 (7th Cir.1998)
18          (noting in dicta that it might be "necessary to distinguish among religious
            affiliation, a religion's general tenets, and a specific religious belief").
19

20  United States v. Girouard, 521 F.3d 110, 114 (1st Cir. 2008).

21  Moreover, expanding "religion" to Batson challenges would be a dicey proposition.  The

22  separation between religion and life's philosophy are not clearly demarcated.  In addition, certain

23  religions may well have tenets at odds with the controlling law, e.g., drug use, participation in

24  capital punishment proceedings.  It could not be, for example, that one could be dismissed from a

25  capital case jury because he would refuse to ever make a finding that someone was eligible for

26  capital punishment, but to simply state that such was based on a religious belief would immunize

1  the juror from dismissal.  Therefore, were the court to consider the merits of this claim, it could

2  not be a violation of clearly established Supreme Court authority.  For these reasons, this claim

3  should be denied.

4  G.  Claim 7: Vagueness–Murder

5  Petitioner argues that California law regarding murder is vague because it failed to

6  give adequate notice to petitioner and members of the public that the crime of murder may be

7  committed when an injury is inflicted in utero prior to the baby's live birth.[4]

8  "[C]riminal statutes which fail to give due process that an act has been made

9  criminal before it is done are unconstitutional deprivations of due process of law."  Jordan v.

10  DeGeorge, 341 U.S. 223, 230, 71 S.Ct. 703 (1951).  A statute is void for vagueness if it fails to

11  define the offense with sufficient definiteness so that ordinary people can understand what

12  conduct is prohibited.  Vlasak v. Superior Court of California, 329 F.3d 683, 688-89 (9th Cir.

13  2003).  In a facial vagueness challenge, the court must look to the plain language of the statute,

14  as well as construe the statute as it has been interpreted by state courts.  Nunez by Nunez v. City

15  of San Diego, 114 F.3d 935, 941-42 (9th Cir. 1997).

16  On appeal, petitioner raised his vagueness challenge, although phrased somewhat

17  differently.  The California Court of Appeal denied this claim for the following reasons:

18  Defendant contends he could not properly be convicted of murdering Marcel, "a
   human being," because "[t]he fatal act ... occurred before Marcel was born." He

19  asserts that the issue turns on whether a fetus is considered a human being in the
   eyes of the criminal law. He then concludes that under section 187, which

20  distinguishes between the murder of a fetus and the murder of a human being, he
   could properly have been convicted, if at all, only of the former offense.FN3 We

21  disagree.

22  FN3. Section 187 provides as relevant:"(a) Murder is the unlawful killing
   of a human being, or a fetus, with malice aforethought.

23

24  "(b) This section shall not apply to any person who commits an act that results in
   the death of a fetus if [it is a lawful therapeutic abortion].

25  _____

26  [4]  Petitioner is not particularly clear in the amended petition as to what legal claim he is
   raising in claim 9.  The court construes claim 9 to be raising a vagueness challenge.

37

"(c) Subdivision (b) shall not be construed to prohibit the prosecution of any person under any other provision of law."

As we shall explain, defendant's first premise is flawed. In defining the offense in this case, the law looks to the instant of death, not to when defendant did the act that ultimately caused death. Because Marcel was a human being when he died, defendant's conviction for the murder of a human being was proper.

At common law, when a child was born alive but subsequently died due to injuries inflicted before birth on the mother, the crime was murder or manslaughter; if the child was born dead, there was no homicide. (1 Witkin & Epstein, Cal.Criminal Law (3d ed. 2000) Crimes Against the Person, § 96, p. 712; hereafter, Witkin & Epstein.) Section 187 did not modify that common law rule as to live-born babies. ( Id. at pp. 712-713.)

If a fetus is born alive after an attack on the mother but subsequently dies, it is a human being at the time of death for purposes of the manslaughter statute. (§ 192; People v. Dennis (1998) 17 Cal.4th 468, 505-506, 71 Cal.Rptr.2d 680, 950 P.2d 1035.) Unlike section 187, section 192 does not cover the killing of a fetus. However, it would be illogical to conclude that once a fetus has been born it is a human being for purposes of manslaughter but not for purposes of murder. The only distinction between a manslaughter case and a murder case on such facts is whether the defendant's attack on the mother was spurred by malice aforethought toward the fetus. This distinction has no bearing on whether the victim is a human being within the meaning of section 187.

We conclude that if (1) a defendant, acting with malice aforethought toward the fetus in a woman's womb, assaults the woman; (2) in consequence, the fetus must be delivered prematurely; and (3) the fetus is born alive but later dies of causes to which the prematurity contributed substantially, the defendant has murdered a human being. (§ 187, subd. (a); see People v. Dennis, supra, 17 Cal.4th 468, 505-506, 71 Cal.Rptr.2d 680, 950 P.2d 1035; 1 Witkin & Epstein, supra, § 96, pp. 712-713.)

Defendant asserts that such a construction of section 187 amounts to an unacceptable "relation back" theory of culpability. Defendant is mistaken. As we have shown, the law of manslaughter, as explained in People v. Dennis, supra, 17 Cal.4th 468, 71 Cal.Rptr.2d 680, 950 P.2d 1035, defines the defendant's crime by the victim's status as a human being at the time of the victim's death, even if the acts that proximately caused his death occurred before his birth. By analogy, so should the law of murder. Nothing is "relat [ed] back": the law simply takes the victim as it finds him.

Defendant relies on Justus v. Atchison (1977) 19 Cal.3d 564, 139 Cal.Rptr. 97, 565 P.2d 122 ( Justus ) (disapproved on other grounds in Ochoa v. Superior Court (1985) 39 Cal.3d 159, 171, 216 Cal.Rptr. 661, 703 P.2d 1), which held that under California's wrongful death statute, triggered by the death of a "person" (Code Civ. Proc., former § 377; see now § 377.60; Stats.1992, ch. 178, §§ 19-20), a cause of action would not lie for the death of a stillborn fetus. His reliance is misplaced.

In Justus, supra, 19 Cal.3d 564, 139 Cal.Rptr. 97, 565 P.2d 122, the court found that the Legislature had not expressly incorporated the definition of "an existing person" in Civil Code former section 29 (repealed by Stats.1993, ch. 19, § 2), which included a fetus, into the wrongful death statute, and held that the Legislature had thus impliedly excluded fetuses from the statute's coverage. ( Justus, supra, at pp. 578-579, 139 Cal.Rptr. 97, 565 P.2d 122.) The court also noted that the Legislature had "specially identified the object of its concern," either by express language or the incorporation of Civil Code former section 29, "in the limited instances in which the Legislature has extended the protection of the criminal law to the unborn child." ( Justus, supra, 19 Cal.3d at p. 579, 139 Cal.Rptr. 97, 565 P.2d 122.)

Defendant asserts Justus, supra, 19 Cal.3d 564, 139 Cal.Rptr. 97, 565 P.2d 122, in effect created a rule that criminal liability based on harm to a live child from "a prenatal act" can stem only from a statute analogous to Civil Code former section 29 or expressly incorporating it. He is wrong for several reasons.

First, the sole issue in Justus, supra, 19 Cal.3d 564, 139 Cal.Rptr. 97, 565 P.2d 122, was how to construe the wrongful death statute; thus the court's discussion of criminal law is dictum. Second, the court grounded its holding on the premise that the wrongful death cause of action, as a pure creature of statute, must be limited to the precise terms used by the Legislature ( id. at p. 575, 139 Cal.Rptr. 97, 565 P.2d 122); by contrast, section 187 codifies the common law of murder and has not changed it in any material way. (See 1 Witkin & Epstein, supra, § 96, pp. 712-713.) Third, defendant has not shown that "human being" as used in section 187 is synonymous with "person" as used in the civil law, whether in the wrongful death statute (Code Civ. Proc., § 377.60) or in Civil Code former section 29. Lastly, as we have explained, the victim in this case was not an "unborn child" as the term is used in Justus.

Defendant also cites Reyes v. Superior Court (1977) 75 Cal.App.3d 214 at pages 218 through 219, 141 Cal.Rptr. 912 ( Reyes ), which held in reliance on Justus, supra, 19 Cal.3d 564, 139 Cal.Rptr. 97, 565 P.2d 122, that the alleged mistreatment of a fetus will not support a criminal prosecution for child endangerment (§ 273a). However, Reyes is distinguishable because the alleged criminal conduct constituting endangerment (the mother's use of heroin while pregnant), including the resulting harm (fetal addiction), was complete before the fetuses were born. ( Reyes, supra, 75 Cal.App.3d at p. 216, 141 Cal.Rptr. 912.)

In conclusion, defendant has failed to show that he could not be convicted for the murder of a human being on the facts in this case.

Opinion of California Court of Appeal, pp. 8-12.

It appears to the undersigned that petitioner is more arguing that the Court of Appeal got the state law wrong (an impermissible argument in habeas corpus, Medley v. Runnels, 506 F.3d 857, 862 (9th Cir. 2007) (en banc)) as opposed to an argument that the statute is vague.  Also, petitioner has not made a Bouie claim: unforeseeable state court interpretation of

a criminal statute violated due process, <u>Bouie v. City of Columbia</u>, 378 U.S. 347, 354-55, 84 S.Ct. 1967 (1964).

Based on the case law cited by the California Court of Appeal, this court finds that a person of ordinary intelligence would understand that the crime of murder may be committed when an injury is inflicted in utero prior to the baby's live birth.  The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

H.  <u>Claim 8:  Vagueness–Enhancement</u>

Petitioner argues that California Penal Code § 12022.9(a) is unconstitutionally vague because it failed to give adequate notice to petitioner and members of the public that the enhancement generally applied to pregnancies resulting in live birth.

In addressing petitioner's claim that there was insufficient evidence to support this enhancement, the California Court of Appeal addressed petitioner's related vagueness claim:

> Defendant contends the jury's finding as to count 2 that he terminated White's pregnancy is not supported by the evidence, because as a matter of law "termination of ... pregnancy" as used in section 12022.9, former subdivision (a), can only mean a miscarriage or an abortion.FN10 We conclude he has not supported this contention.
>
> FN10. Section 12022.9, former subdivision (a), in effect at the time of trial, provided: "Any person who, during the commission or attempted commission of a felony, knows or reasonably should know that the victim is pregnant, and who, with intent to inflict injury, and without the consent of the woman, personally inflicts injury upon a pregnant woman that results in the termination of the pregnancy shall, in addition and consecutive to the punishment prescribed by the felony or attempted felony of which the person has been convicted, be punished by an additional term of five years in the state prison. The additional term provided in this subdivision shall not be imposed unless the fact of that injury is charged in the accusatory pleading and admitted or found to be true by the trier of fact. [¶] Nothing in this subdivision shall be construed as affecting the applicability of subdivision (a) of Section 187 of the Penal Code."The statute was later amended to delete former subdivision (b) and renumbered without subdivisions, but not materially changed. (Stats.2002, ch. 126, § 7.)

\\\\\

40

" ' "We begin with the fundamental rule that our primary task in construing a statute is to determine the Legislature's intent. [Citation.]" [Citation.] " 'The court turns first to the words themselves for the answer.' [Citations.]" [Citation.] When the statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it. [Citation.] The plain language of the statute establishes what was intended by the Legislature. [Citation.] [Citation.]" ' " (People v. Statum (2002) 28 Cal.4th 682, 689-690, 122 Cal.Rptr.2d 572, 50 P.3d 355.)

The plain meaning of former section 12022.9 does not limit its application to cases of miscarriage or abortion. Moreover, defendant cites no authority so limiting the term "termination of pregnancy" in section 12022.9. Instead, he offers definitions of the term in unrelated statutes and case law, plus what he calls "an examination of probable legislative intent" devoid of any actual indicia of such intent. He also asserts that his preferred definition accords with the clear and unambiguous meaning of the term in ordinary usage, but again fails to provide any relevant authority for this claim-not even a dictionary definition. Legal contentions unsupported by apposite authority are waived. ( Amato v. Mercury Casualty Co., supra, 18 Cal.App.4th 1784, 1794, 23 Cal.Rptr.2d 73.)

In Dennis, supra, 17 Cal.4th 468, 71 Cal.Rptr.2d 680, 950 P.2d 1035, the only published case thus far to address section 12022.9, the court noted: "As an enhancement, section 12022.9 does not represent an alternative to a charge of fetal murder in violation of section 187. Instead, it imposes an additional punishment for committing, or attempting to commit, a felony in a manner that intentionally injures a pregnant woman and results in termination of her pregnancy. The enhancement relates to the particular injury a defendant inflicts on a woman in committing the substantive crime." ( Dennis, supra, 17 Cal.4th at p. 501, 71 Cal.Rptr.2d 680, 950 P.2d 1035; italics added.) Although Dennis does not discuss the precise issue before us now, its reasoning is instructive.

Dennis, supra, 17 Cal.4th 468, 71 Cal.Rptr.2d 680, 950 P.2d 1035, teaches that the point of the enhancement is to punish the defendant for injuring a woman in a particular manner with a particular result, not for the particular harm that comes to the fetus she is carrying. Given this logic, the enhancement is properly imposed when the pregnancy "terminates"-i.e., ends-in any manner as a result of the defendant's intentional felonious act. If only a miscarriage or an abortion could constitute the "termination" of a pregnancy under this statute, the Legislature could have so specified. Here, defendant's assault on Garvon White ended her ongoing pregnancy two months prematurely by forcing the immediate delivery of her fetus through a C-section. Under the logic of Dennis, and applying the plain language of the statute, we conclude that the enhancement was supported by the evidence.

Opinion of California Court of Appeal, pp. 30-33.

Based on the reasoning of the California Court of Appeal, this court finds that a person of ordinary intelligence would have understood that Cal. Penal Code § 12022.9(a) applied to pregnancies resulting in live birth.  The plain language of the statute indicates that it applies to

1    pregnancies resulting in live births.  In addition, Dennis, supra, would have put a person of

2    ordinary intelligence on notice that it applied to pregnancies resulting in live births.

3           The denial of this claim by the California Court of Appeal was not an

4    unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

5    should be denied.

6           I.  Claim 9: Insufficient Evidence of Causation

7           Petitioner argues that there was insufficient evidence that he legally and

8    proximately caused the death of Marcel.

9           When a challenge is brought alleging insufficient evidence, federal habeas corpus

10   relief is available if it is found that upon the record evidence adduced at trial, viewed in the light

11   most favorable to the prosecution, no rational trier of fact could have found "the essential

12   elements of the crime" proven beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,

13   319, 99 S. Ct. 2781, 2789 (1979).  Under Jackson, the court reviews the entire record when the

14   sufficiency of the evidence is challenged on habeas.  Adamson v. Ricketts, 758 F.2d 441, 448 n.

15   11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483

16   U.S. 1 (1987).  It is the province of the jury to "resolve conflicts in the testimony, to weigh the

17   evidence, and to draw reasonable inferences from basic facts."  Jackson, 443 U.S. at 319, 99 S.

18   Ct. at 2789.  "The question is not whether we are personally convinced beyond a reasonable

19   doubt.  It is whether rational jurors could have reached the same conclusion that these jurors

20   reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

21          If the trier of fact could draw conflicting inferences from the evidence, the court in

22   its review will assign the inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465,

23   469 (9th Cir. 1994).  The fact that petitioner can construct from the evidence alternative scenarios

24   at odds with the verdict does not mean that the evidence was insufficient, i.e., that no reasonable

25   trier of fact could have found the conviction scenario beyond a reasonable doubt.

26   \\\\\

In reviewing the sufficiency of the evidence supporting a conviction, we search the record to determine "whether a reasonable jury, after viewing the evidence in the light most favorable to the government, could have found the defendants guilty beyond a reasonable doubt of each essential element of the crime charged." United States v. Douglass, 780 F.2d 1472, 1476 (9th Cir.1986). *The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict.* United States v. Fleishman, 684 F.2d 1329, 1340 (9th Cir.), cert. denied, 459 U.S. 1044, 103 S. Ct. 464, 74 L. Ed.2d 614 (1982); United States v. Federico, 658 F.2d 1337, 1343 (9th Cir.1981), overruled on other grounds, United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc). United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991) (emphasis added).

U.S. v. Mares, 940 F.2d 455, 458 (9th Cir. 1991).

Superimposed on these already stringent insufficiency standards is the AEDPA requirement that even if a federal court were to initially find on its own that no reasonable jury should have arrived at its conclusion, the federal court must also determine that the state appellate court not have affirmed the verdict under the Jackson standard in the absence of an unreasonable determination. Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

In the section above addressing petitioner's claim that the trial court failed to sua sponte read the proximate cause instruction, the court set forth the portion of the opinion by the California Court of Appeal denying petitioner's claim alleging insufficient evidence that he caused Marcel's death.  For the reasons stated by the California Court of Appeal above, this court finds that there was sufficient evidence that he caused Marcel's death.

The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

### J.  Claim 10: Jury Instruction Error

Petitioner argues that the trial court erred by failing to instruct the jury as to attempted murder, a lesser included offense.

\\\\\\

1    The constitutional right to have the jury instructed on a lesser-included offense in

2 certain instances was extended to capital murder defendants in 1980.  See Beck v. Alabama, 447

3 U.S. 625, 100 S.Ct. 2382 (1980).  Since that time, the Ninth Circuit in Bashor v. Risley has held

4 "the failure of a state court to instruct on a lesser included offense [in a non-capital case] fails to

5 present a federal constitutional question and will not be considered in a federal habeas corpus

6 proceeding."  730 F.2d 1228, 1240 (9th Cir. 1984).  The Bashor court stated that there may be

7 exceptions to this general statement "because the criminal defendant is also entitled to adequate

8 instructions on his or her theory of defense."  730 F.2d at 1240.  This court, however, is barred

9 from creating such a rule, as habeas corpus "cannot be used as a vehicle to create new

10 constitutional rules of criminal procedures."  Teague v. Lane, 489 U.S. 288, 316, 109 S.Ct. 1060

11 (1989).

12    Because a claim alleging failure by the state court to instruct on a lesser included

13 offense is not cognizable in federal habeas, the instant claim is without merit.[5]

14    K.  Claim 11: Ineffective Assistance of Trial and Appellate Counsel

15    *Legal Standard*

16    A claim of ineffective assistance of appellate counsel utilizes the same Strickland

17 standard that is applied to trial counsel.  Smith v. Robbins, 528 U.S. 259, 287, 120 S. Ct. 746,

18 765 (2000).

19    The test for demonstrating ineffective assistance of counsel is set forth in

20 Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show

21 that, considering all the circumstances, counsel's performance fell below an objective standard of

22 reasonableness.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must

23 identify the acts or omissions that are alleged not to have been the result of reasonable

24

25    [5] Also, the undersigned does not understand the logic of this claim.  If one attempts
murder of a human being, but the fact of death after the attempt lingers for awhile, the ultimate
26 death will nearly always supersede the attempt, i.e., the only possible charge is murder.

professional judgment.  Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  Id., 104 S. Ct. at 2066.  "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at 693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id., 104 S. Ct. at 2068.

In extraordinary cases, ineffective assistance of counsel claims are evaluated based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct. 1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

The Supreme Court has recently emphasized the importance of giving deference to trial counsel's decisions, especially in the AEDPA context:

> In Strickland we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689, 104 S.Ct. 2052.  Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

> For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly.  See Williams, supra, at 411, 65 S. Ct. 363.  Rather, he must show that the [ ]Court of Appeals applied Strickland to the

1  facts of his case in an objectively unreasonable manner.

2  Bell v. Cone, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

3  *Failure to Object to Constructive Shackling*

4  Petitioner argues that his trial counsel was ineffective for failing to make every

5  effort to keep petitioner's custody status from being disclosed to the jury.  Assuming counsel's

6  failure to address the propriety of revealing petitioner's custodial status to the jury did not fall

7  below the standard of competent counsel, petitioner argues that counsel was ineffective for

8  failing to request an adequate advisement concerning his custodial status.

9  As discussed above, there is no evidence in the record demonstrating that the jury

10  saw petitioner in physical restraints, i.e. shackles.  However, the record is clear that the jury was

11  aware that petitioner was in custody.

12  Petitioner provides no authority in support of his claim that counsel had good

13  grounds to object that the jury should not have known of his custody status.  As discussed above,

14  the United States Supreme Court has never held that the jury's knowledge of a criminal

15  defendant's custody status is unconstitutional.  Under California law, "the mere fact that the jury

16  is made aware of a defendant's custodial status does not deprive the defendant of his

17  constitutional rights."  People v. Valdez, 32 Cal.4th 73, 121, 8 Cal.Rptr.3d 271 (2004).  Because

18  this court is aware of no legal grounds to support the objection urged, it finds that petitioner's

19  counsel was not ineffective for failing to make this objection or to request the advisement

20  concerning petitioner's custodial status.

21  After independently reviewing the record, the court finds that the denial of this

22  claim by the California Supreme Court was not an unreasonable application of clearly established

23  Supreme Court authority.  Accordingly, this claim should be denied.

24  *Failure to Object to Causation Instructions or Request Adequate Instructions*

25  Petitioner argues that his trial counsel was ineffective for failing to request

26  CALJIC 3.40.  As discussed above, in claim four petitioner argued that the trial court erred in

46

1    failing to give this instruction sua sponte.  In the discussion of claim four above, the court found

2    that petitioner was not prejudiced by the trial court's failure to give this instruction.  For the same

3    reason, the court finds that petitioner was not prejudiced by counsel's failure to request this

4    instruction.

5           Petitioner also argues that appellate counsel was ineffective for failing to raise this

6    claim on appeal.  As discussed above, appellate counsel did raise this claim on appeal but it was

7    found defaulted by trial counsel's failure to object.  This claim is without merit.

8           After independently reviewing the record, the court finds that the denial of this

9    claim by the California Supreme Court was not an unreasonable application of clearly established

10   Supreme Court authority.  Accordingly, this claim should be denied.

11               *Failure to Object to Prosecutor's Discriminatory Religious Challenges*

12          Petitioner argues that trial counsel was ineffective for failing to object to the

13   prosecutor's use of the peremptory challenge based upon potential juror Hubbard's religion.

14          In its discussion of petitioner's related <u>Wheeler</u> claim, the California Court of

15   Appeal expressed doubt as to whether such an objection had merit under California law:

16               Whether the exclusion of jurors based on religion per se raises a cognizable
                 <u>Wheeler</u> claim is at best ambiguous in current law.  Defendant does not cite any
17               case law that says so expressly and unequivocally.  He relies on <u>People v. Martin</u>
                 (1998) 64 Cal.App.4th 378, in which the court construed dictum in <u>Wheeler</u>,
18               <u>supra</u>, 22 Cal.3d 258, as leaving open the possibility of extending its rule to
                 religious discrimination but did not find such discrimination in the case at bench
19               because the challenged juror had revealed that his specific beliefs would preclude
                 jury service.  (<u>People v. Martin</u>, <u>supra</u>, 64 Cal.App.4th at pp. 384-385; <u>see also</u>
20               <u>People v. Garcia</u> (2000) 77 Cal.App.4th 1269 1281 fn. 9.)  Defendant also cites
                 <u>People v. Allen</u> (1989) 212 Cal.App.3d 306 at page 312, in which the court
21               referred in a footnote to dictum from <u>People v. Johnson</u> (1989) 47 Cal.3d 1194 at
                 page 1215, stating summarily that religious bias is a cognizable form of group
22               bias.  (<u>People v. Allen</u>, <u>supra</u>, 212 Cal.App.3d at p. 312, fn 4; <u>see People v.</u>
                 <u>Garcia</u>, <u>supra</u>, 77 Cal.App.4th 1269, 1281, fn. 9 [explaining why statement from
23               <u>People v. Johnson</u>, <u>supra</u>, 47 Cal.3d 1194 is dictum].) [Footnote]

24               [Footnote: In <u>People v. Cash</u> (2002) 28 Cal.4th 703, not cited by
                 defendant, our Supreme Court recently commented on this issue without
25               coming any closer to resolving it.  The court first stated: "Although this
                 court has described the protections against group exclusion as including
26               religious affiliation, the United State Supreme Court has only applied

47

1       Batson [v. Kentucky (1986) 476 U.S. 79 [90 L.Ed.2d 69]] to forbid group
exclusion based on race or gender. [Citations.]" (People v. Cash, supra, 28
2  Cal.4th at p. 724 (not citing any California Supreme Court case).)   The
court then found that the prosecutor's stated reasons for excluding a juror
3  raised as a Jehovah's Witness which included both religious and
nonreligious grounds, were facially plausible and sufficient to rebut the
4  defendant's claim of racial discrimination (which, as in our case, was the
only one raised by the defendant).  (Id. at pp. 724-726.)]

5

6       Given the vagueness of the current law on this issue, it would be unfair to impose
a duty on this trial court to have inquired sua sponte, without being prompted by
7  any argument from the defendant, whether the prosecutor had improperly
excluded jurors based on religious bias.

8  Opinion of California Court of Appeal, pp. 22-24.

9       In the instant case, the prosecutor did not reject Mr. Hubbard based on his religion

10  per se.  Rather, she stated that in her experience, people with religions convictions as strong as

11  Mr. Hubbard's had difficulty judging criminal cases.  She was also concerned by the fact that

12  petitioner had a Bible sitting in front of him.  As discussed by the California Court of Appeal,

13  this type of peremptory challenge has been upheld by California courts.  See People v. Martin, 64

14  Cal.App.4th 378, 385, 75 Cal.Rptr.2d 147 (1998) (Wheeler does not preclude a peremptory

15  challenge to a juror on the basis of the juror's relevant personal values "even though those views

16  may be founded in the juror's religious beliefs.").

17       It is true that Mr. Hubbard did not explicitly state that his ability to judge

18  petitioner's case was impacted by his religious beliefs.  However, based on the state of California

19  law, a federal law, see cases cited supra in section F, it is not likely that the trial court would have

20  upheld an objection by petitioner's trial counsel on the grounds now suggested.  For this reason,

21  the court finds that petitioner has failed to demonstrate prejudice based on counsel's failure to

22  make this objection.

23       After independently reviewing the record, the court finds that the denial of this

24  claim by the California Supreme Court was not an unreasonable application of clearly established

25  Supreme Court authority.

26  \\\\\

48

1                *Failure to Object to Prosecutor's Violation of Protective Order*

2                Petitioner argues that counsel was ineffective for failing to immediately object to

3 the violation of the protective order by Ore.  As discussed above, the California Court of Appeal

4 found that this claim was waived by counsel's failure to timely object.

5                Part of the problem with this claim is that petitioner does not explain how the

6 outcome would have been different had counsel objected at the time of the testimony.  Petitioner

7 does not explain how the remedy fashioned by the trial court for the violation of the protective

8 order would have been any different had counsel timely objected.  This court finds it unlikely that

9 the remedy for the violation of this order would have been different had counsel timely objected.

10                The only consequence this court can find of trial counsel's failure to timely object

11 is that the California Court of Appeal found petitioner's related prosecutorial misconduct claim

12 to be waived.  However, as discussed above, this claim had no merit anyway as there was no

13 evidence of misconduct by the prosecutor.  Accordingly, the court does not find that petitioner

14 suffered prejudiced as a result of counsel's failure to timely object.

15                After independently reviewing the record, the court finds that the denial of this

16 claim by the California Supreme Court was not an unreasonable application of clearly established

17 Supreme Court authority.

18                *Failure to Argue in Opening Brief that Petitioner Entitled to Instruction on*

19                          *Attempted Murder of Human Being*

20                Petitioner argues that appellate counsel was ineffective for failing to properly raise

21 in the opening brief the claim that if attempted murder of a fetus was not a lesser included

22 offense, then petitioner was entitled to an instruction on attempted murder of a human being as a

23 lesser included offense.  Petitioner also argues that appellate counsel was ineffective for failing to

24 cite any authority in support of this proposition.

25                On appeal, petitioner argued that the trial court erred by failing to instruct sua

26 sponte on attempted murder of a fetus as a lesser included offense.  In his appellate reply brief, he

1  argued for the first time that if attempted murder of a fetus was not a lesser included offense

2  under the operative pleading, then he was entitled to an instruction on attempted murder of a

3  human being as a lesser included offense.  Opinion of California Court of Appeal, pp. 25-26.

4       The California Court of Appeal found that petitioner had waived his claim raised

5  for the first time in his reply brief but went on to address its merits:

6      It is improper to raise new contentions in the reply brief.  (Neighbours v. Buzz
   Oates Enterprises (1990) 217 Cal.App.3d 325, 335, fn. 8.) [Footnote omitted.]
7  Therefore, this contention is forfeited.

8      In any event, defendant does not cite any authority holding that attempted murder
   is a lesser included offense to murder, but merely asserts this proposition.  A legal
9  proposition asserted with apposite authority necessarily fails.  (Amato v. Mercuty
   Casualty Co. (1993) 18 Cal.App.4th 1784, 1794.)

10

11     But even assuming that attempted murder of a human being was a lesser included
   offense to murder as pleaded here, and even assuming an instruction on attempted
   murder of a human being should have been given, any error in failing so to
12 instruct was harmless: in light of the entire cause, including the evidence, it is not
   reasonably probable that defendant would have obtained a more favorable
13 outcome had the instruction been given.  (People v. Breverman, supra, 19 Cal.4th
   at p. 178.)  His conduct was brutal, and the words he spoke as he repeatedly
14 punched Gavon White in the stomach–"I don't want this bitch to have my
   baby"–made clear his intent to kill the fetus she was carrying.  On these facts a
15 reasonable jury could not have found that his crime was merely one of attempt.

16 Opinion of California Court of Appeal, pp. 26-27.

17      Although appellate counsel failed to properly raise the claim alleging that

18 petitioner was entitled to an instruction on attempted murder of a human being as a lesser

19 included offense, the California Court of Appeal addressed the merits of this claim anyway.

20 Because the California Court of Appeal found that this claim was without merit, petitioner was

21 not prejudiced by appellate counsel's failure to properly raise this claim.  Nor does petitioner cite

22 any authority that appellate counsel should have cited that would have changed the outcome of

23 the state appellate decision.

24      After independently reviewing the record, the court finds that the denial of this

25 claim by the California Supreme Court was not an unreasonable application of clearly established

26 Supreme Court authority.

1                 *Failure to Investigate and Locate Medical Experts*

2                 Petitioner argues that trial counsel was ineffective for failing to locate and call as

3 an expert witness a medical expert who could have provided additional testimony concerning the

4 likelihood of NEC developing in babies born to term.  In support of this claim, petitioner argues

5 that the prosecutor's experts conceded that NEC may develop in some full term babies and that

6 Marcel's heart condition, not caused by petitioner's assault, was a risk factor for development of

7 NEC.

8                 As discussed above, the testimony of the doctors was clear that Marcel died as a

9 result of complications caused by his premature birth.  Petitioner does identify any expert or who

10 could have actually testified differently regarding Marcel's chances of developing NEC had he

11 been born to term.  Such a conclusory claim should be dismissed.  James v. Borg, 24 F.3d 20, 26

12 (9th Cir. 1994) (holding that conclusory allegations which are not supported by a statement of

13 specific facts do not warrant habeas relief); Shah v. U.S., 878 F.2d 1156, 1161 (9th Cir. 1989)

14 (vague or mere conclusory allegations do not warrant an evidentiary hearing).

15                 After independently reviewing the record, the court finds that the denial of this

16 claim by the California Supreme Court was not an unreasonable application of clearly established

17 Supreme Court authority.

18                 *Failure to Argue that Peremptory Challenges*

19                 Petitioner argues that appellate counsel was ineffective for failing to argue on

20 appeal that the prosecutor's use of peremptory challenges to strike potential jurors Hubbard and

21 Wade based on race violated Batson, supra. As discussed above, on appeal, appellate counsel

22 argued that the use of a peremptory challenge to strike Hubbard based on his religious views

23 violated Batson.

24                 As discussed above, petitioner's Batson claims based on race are without merit.

25 Had appellate counsel raised these claims on appeal, they would have been rejected.  In any

26 event, these claims were raised in petitioner's habeas petition filed in the California Supreme

1   Court.  Petitioner does not explain how he was prejudiced by raising these claims in his habeas

2   petition rather than on direct appeal.

3            After independently reviewing the record, the court finds that the denial of this

4   claim by the California Supreme Court was not an unreasonable application of clearly established

5   Supreme Court authority.

6            Accordingly, IT IS HEREBY ORDERED that petitioner's October 27, 2007,

7   motion for discovery is denied; and

8            IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

9   habeas corpus be denied.

10            These findings and recommendations are submitted to the United States District

11  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

12  days after being served with these findings and recommendations, any party may file written

13  objections with the court and serve a copy on all parties.  Such a document should be captioned

14  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15  shall be served and filed within ten days after service of the objections.  The parties are advised

16  that failure to file objections within the specified time may waive the right to appeal the District

17  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

18  DATED: 08/07/08

19                                          /s/ Gregory G. Hollows

20  taylor.157                          _____
                                         UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26